**Valentine John KARP, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16375.**

United States Court of Appeals
Eighth Circuit.

April 25, 1960.

Charles L. Edson, St. Louis, Mo., for appellant.

Philip C. Lovrien, Asst. U. S. Atty., Sioux City, Iowa, made oral argument, F. E. Van Alstine, U. S. Atty., and Mr. William R. Crary, Asst. U. S. Atty., Sioux City, Iowa, were with Mr. Lovrien on the brief for appellee.

Before SANBORN, VAN OOSTER-HOUT and MATTHES, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

Defendant Valentine Karp appeals from his conviction on count two of an indictment charging him with robbing on June 10, 1959, the Lakota branch of the Farmers Trust and Savings Bank of Buffalo Center, Iowa, the deposits of which were insured by the Federal Deposit Insurance Corporation, in violation of 18 U.S.C.A. § 2113(a).

The jury, in answer to a special interrogatory, found defendant while committing said offense did assault or put the lives of the bank employees in jeopardy by the use of a dangerous weapon. Defendant was sentenced to imprisonment for a term of fifteen years.

Defendant has filed timely notice of appeal and has been permitted to prosecute this appeal in forma pauperis. This court has appointed Charles L. Edson to act as attorney for defendant in connection with this appeal. We wish to thank Mr. Edson for the excellent brief and oral argument he presented on behalf of the defendant, and for his efficient representation of the defendant.

Inasmuch as the defendant in this appeal raises no question as to the sufficiency of the evidence to sustain the conviction, there is no need to set out the evidence in detail.

Defendant relies upon the following asserted errors for reversal:

"1. The Trial Court committed reversible error by denying defendant's motion to suppress the receipt books and the bank deposit slip taken from defendant's home without a warrant.

"2. The Trial Court committed reversible error by denying defendant his right to examine a prior statement made by a Government witness, concerning subject matter testified to at the trial, contrary to the requirements of Section 3500 of Title 18 of the U.S.Code."

The error first asserted pertains to the court's failure to suppress certain receipt books and a bank deposit slip. Since the factual situation with reference to such items differs, separate discussion is required as to each.

In a motion to suppress filed before trial, the defendant in the first paragraph contends that certain described property was illegally seized from him and from a hotel room in Montana.

The second paragraph reads:

"The following items were unlawfully seized from him without a search warrant at his residence at Hartland, Minnesota by F. B. I. agents from Rochester, Minnesota, on July 7th, 1959:

"certain receipt books for towns in Northern Iowa and Southern Minnesota which disclose dates and receipts of large sums of money received by him from various customers of his in these areas."

In the fourth paragraph of the motion, defendant states:

"He also asks for return and suppression of the evidence described in paragraph one and for the return of the evidence described in paragraph two."

A hearing was held on the motion to suppress on October 19, 1959. The record shows the following proceedings:

"Mr. Flattery [counsel for defendant] : And we also ask that the receipt books be returned to this defendant because they were all obtained without a warrant; search warrant. The search was unreasonable and it was illegal. They had no right—The Government had no right to go to Mr. Karp's home and go down into his basement without a search warrant and to take things that belonged to him, and for the further reason, your Honor, that these receipt books will be needed by this defendant upon the trial of this case.

"The Court: You do not really want them suppressed, do you?

"Mr. Flattery: I want them, at least, returned your Honor, because there are certain names and addresses that appear on these receipts.

"The Court: Does the Government intend to use them in its case in chief?

"Mr. Lovrien: Probably. That depends on just how the evidence shapes up.

"We are in this position: I have told Mr. Flattery—of course, the moving to suppress is one thing; asking for them as a matter of right for them to use as evidence, is another one. We aren't in any position where we want to say, 'well, we will turn them over to you, then, and if you decide not to use them * * *' they are gone from us.

"The Court: That is not what they have in mind. It is discovery, and that is the right to look them over. Of course, they would remain in the custody of the clerk or the reporter. That is a different matter. The right to pre-trial examination relates to discovery rather than suppression.

"Mr. Lovrien: We won't even contest that kind of a motion.

"The Court: You can examine all you want, and they will be here, as I understand it, and then you can put them in, if you wish, if they do not put them in.

"Mr. Flattery: They will be available in the clerk's office?

"The Court: Generally, until they are admitted in evidence, they do not turn them over to the reporter. They can be made available at the clerk's office.

"Mr. Lovrien: We can turn them over to Mr. Flattery. That would be all right with us.

"The Court: There is a difference in turning them over to Mr. Flattery, and in turning them over to the defendant.

"As far as Mr. Flattery is concerned, the Court has nothing but trust and confidence in Mr. Flattery, but the defendant is not a member of the Bar, and to the Court, there is always a difference between lawyers and laymen when it comes to handling exhibits and things."

It is to be observed that defendant in his motion expressly asked for the suppression of the evidence seized in Montana but only asked for the return of the receipt books. In the discussion hereinabove set out, defendant's counsel also only asked for return of the receipt books. We feel certain that when viewed in the light of the surrounding circumstances, the defendant's omission to ask for the suppression of the receipt books was intentional rather than inadvertent.

As to the Montana property which he desired to have suppressed, he in his motion and again orally stressed his claim for suppression. Defendant in his motion and at all times, and particularly as a witness at the trial, insisted that the receipt books would prove that he had collected large sums of honest money due him for fire numbers during the few days preceding the bank robbery. Such an attitude on the part of the defendant would explain why the motion did not request the suppression of the receipt books and would fully justify his counsel's interpretation of the motion in his conversation with the court above set out so far as it pertains to the receipt books as a discovery motion. A satisfactory solution for the discovery of the receipt books was arrived at.

Defendant was engaged in the business of selling fire numbers and signs to farmers, usually for $8 a sign, which included the cost of erecting the sign and certain services. Defendant at the time of his arrest had about $400 currency in his possession. He told officers that the bulk of this money had come from collections he had made on June 8 and 9 of amounts due him for fire signs, and that such collections would be reflected in his receipt books which he had left in his car when he abandoned it at Wells, Minnesota.

His wife subsequently picked up the car and took the receipt books therefrom and stored them in the home of defendant and his wife. The defendant on June 10, the day of the robbery, left for Montana and did not advise his wife where he was going or when he would be back.

The receipt books were obtained by F. B. I. Agent Mahler from Mrs. Karp at her residence on July 6, 1959. Mahler testified that he identified himself as an F. B. I. Agent to Mrs. Karp, and that he then inquired about the receipt books and asked whether Mrs. Karp would make them available to him. Mrs. Karp responded that she would be more than happy to, and said, "You come with me and I will show you right where they are." She then took the agent to the basement and pointed to the receipt books, and said, "Take it. I don't want any of this material."

At the suppression motion hearing, evidence of illegal seizure of property in Montana was offered. Defendant did not offer the testimony of his wife or anyone else to establish any unlawful search or coercion in obtaining the property from defendant's home. At the conclusion of the testimony offered by the defendant in support of the motion, the court stated: "The record is blank on how they got hold of the receipt books at Hartland."

The Government then offered Mahler's testimony heretofore summarized, which has not been contradicted in any respect.

The situation with reference to the deposit slip is somewhat different. The Government offered in evidence at the trial a deposit slip of the robbed bank on the back of which were some drawings made by a bank officer as to the location of certain property that might be for sale in Lakota. The bank official as a witness testified that just prior to the robbery he had made the drawings for the defendant in response to defendant's inquiry as to property that might be available for purchase. The deposit slip was at Mahler's request voluntarily turned over to him by Mrs. Karp at the

Karp home on July 30, 1959. Mrs. Karp told the agent that she had found the deposit slip in the defendant's car. Defendant did not discover that the Government had obtained possession of the deposit slip until Mahler, in his testimony at the motion hearing, disclosed that he had obtained the slip.

The motion, so far as it pertains to property of defendant's taken from his home, is hereinabove quoted. It is plainly apparent from the motion that the deposit slip is not included therein. We find no record of any subsequent motion, either oral or written, wherein the defendant sought to suppress the deposit slip as evidence.

At the trial, defendant's objection to the offer of the deposit slip was: no proper foundation laid—no proof how the exhibit showed up at the home of Anna Karp—incompetent, irrelevant, immaterial, and highly prejudicial. Such objection, even if timely, obviously does not raise the issue of defendant's constitutional right to have the deposit slip suppressed.

■ The court committed no error in failing to suppress the receipt books because defendant's motion did not ask for the suppression of such evidence and because of defendant's implied consent that the motion be treated as a discovery motion only. No error was committed in failing to suppress the deposit slip as no motion was ever made to suppress such evidence.

The trial court did in a formal order find that the receipt books and deposit slip were voluntarily turned over to the Government by the defendant's wife, and that they were not obtained as a result of an illegal search and seizure. The court could not validly rule upon the suppression as evidence of the receipt books and the deposit slip, since for the reasons heretofore set out, no proper motion to suppress such items was before him at the time he made the ruling. Rule 41(e) of the Rules of Criminal Procedure, 18 U.S.C.A. prescribes the method of raising the issue of suppression of evidence and no proper motion

was pending before the court to suppress such evidence within the meaning of said rule.

Because of our holding that the court did not have before it a proper motion to suppress either the receipt books or the deposit slip, we find it unnecessary to consider the troublesome issue reserved in Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654, as to whether it is possible for a wife in the absence of her husband to waive his constitutional protection against search and seizure under the circumstances of this case.

The second error asserted is that the trial court erred in denying defendant his right to examine a prior statement made by F. B. I. Agent Donahue, who had testified at the trial as a witness for the Government.

Defendant urges that he is entitled to examine Donahue's statement by virtue of the Jencks Act, 18 U.S.C.A. § 3500. Mr. Donahue, an F. B. I. agent, as a witness testified that he interviewed defendant the day following his arrest. Donahue related the conversation between him and the defendant at such interview. Donahue admits that he made a report covering the interview and among other things stated that the report contained statements as to the questions asked and answers given by defendant, and that the statement covered matters about which he testified.

The trial court held that the Jencks Act did not apply to reports of government agents and that Donahue's report was not within the scope of the Act, and denied defendant's request that it be produced. The court did not require the Government to produce the report for its inspection, and the report is not a part of the record before this court.

The Supreme Court in 1957 decided the case of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. Controversy arose as to the application of said decision. Congress then enacted the Jencks Act.

The Supreme Court in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287, discusses the Jencks decision, the legislative history leading up to the adoption of the Jencks Act, holds the Act to be constitutional, and further holds that the Act and not the Jencks decision governs the production of statements of witnesses. Various provisions of the Act are interpreted. See also Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304.

Defendant relies principally on the provisions of subsections (b) and (e) of the Jencks Act, which read:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use."

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

The Government argues that by subsection (a) of the Act [1] the operation of the statute is limited to statements given to "an agent of the Government" and that since Donahue himself is a government agent, the Act does not apply. Donahue admits that he made a report to his superior officer. We see no reason why a report of one government agent to another covering an interview with a defendant cannot constitute a "statement" within the meaning of the Act. It appears that subsection (a) deals principally with the time that the statement must be produced—that is, after the witness has testified. The type of statement that must be produced is controlled by the later subsections, particularly (b) and (e). The definition of a statement contained in subsection (e) is specifically made a part of subsection (b) by reference.

We find no cases supporting the Government's contention that reports made by government agents are not within the scope of the Act. The Act has been uniformly applied to government agents called as witnesses. United States v. O'Connor, 2 Cir., 273 F.2d 358, (revenue agent); Holmes v. United States, 4 Cir., 271 F.2d 635, (F. B. I. agent); United States v. Prince, 3 Cir., 264 F.2d 850, (narcotics bureau agent).

We agree with the conclusion reached by the Fourth Circuit upon this issue as stated in the Holmes case, 271 F.2d at page 638:

"Certainly, however, we can find nothing in the Jencks Act which suggests that defense counsel are entitled to no statement of the witness, simply because he happens to be an agent of the FBI."

There is some possibility that agent Donahue's report may be a summary of his interview with the defendant. In Palermo v. United States, supra, 360 U.S. at pages 352–353, 79 S.Ct. at pages 1224–1225, the court discusses the meaning of the words "other recording" found in subsection (e) (2). There is room for doubt here whether the statement of the agent meets the standard of the statute as interpreted in Palermo.

The Supreme Court in Palermo, with reference to such a situation, teaches:

"However, when it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination."

Moreover, here the agent's statement is desired to impeach the agent's own testimony as a witness, not to impeach the testimony of his informer which testimony may be incorporated in the agent's statement. In speaking of such a situation, the court in Holmes supra, 271 F.2d at page 638, states:

"The written report of the agent, however, is just as much a verbatim statement of the agent, who prepares it, as a written statement of an informer, incorporated in the report, is the statement of the informer. It is a statement within the literal and evident meaning of subsection (e) of the Act. Its use to contradict the agent who prepared it in no way contravenes the policy of the Act against the use of an investigator's notes or summaries of information to contradict his informer. In Palermo v. United States, it was held that an agent's summary of information obtained from his informer was not a 'statement' within the meaning of subsection (e) of the Act when its use was sought for purposes of cross examining the informer, but nothing in that opinion suggests the same summary would not

---

1. Subsection (a) provides: "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

be a 'statement' within the meaning of subsection (e) of the Act when its use is sought to cross examine the agent who prepared it, the question being what information the agent actually obtained during the course of his investigation."

In United States v. O'Connor, supra, 273 F.2d at page 360, the court states:

"Since statement is defined by subsection (e) to include 'a written statement made by said witness,' the reports herein involved would clearly seem to fall within the plain language of the statute."

■ We are convinced that the court committed error in not requiring the Government to produce Donahue's statement for *in camera* examination. Without the benefit of an examination of the statement, neither the trial court nor this court is able to state whether the defendant was entitled to examine the agent's statement in whole or in part under the Jencks Act.

While there are some earlier courts of appeals cases to the contrary, it is now made clear by Rosenberg v. United States that the harmless error rule applies to Jencks Act situations. In Rosenberg, although the Supreme Court finds that the statement was improperly excluded, the conviction was affirmed, the court stating [360 U.S. 367, 79 S.Ct. 1236]:

"There is such a thing as harmless error and this clearly was such."

See also Badon v. United States, 5 Cir., 269 F.2d 75; Holmes v. United States, 4 Cir., 271 F.2d 635, supra; Bradford v. United States, 9 Cir., 271 F.2d 58.

Donahue's testimony at the trial was confined to relating what the defendant told him in an interview. Donahue gave no testimony as to any admission of guilt on the part of the defendant. The testimony centered about defendant's statement as to his activities and whereabouts during the period commencing several days before and ending several days after the date of the robbery, including defendant's statement that he had never been in Lakota, the town in which the bank robbery occurred.

Defendant took the witness stand on his own behalf and his testimony covered the same field as covered by Donahue's testimony, and differed in no substantial respect from the testimony given by Donahue. Only two variances in the testimony are pointed out. Donahue testified that the defendant told him that he had slept in his car at Buffalo Center, Iowa, the night before the robbery. Defendant as a witness testified that he slept in the hotel at Buffalo Center, Iowa, on said night. The hotel operator testified that she permitted defendant to sleep in the hotel lobby without charge. The only relevance of the testimony is that Buffalo Center is a few miles from the scene of the robbery. Whether the defendant slept in his car or in the hotel is entirely immaterial.

Donahue testified that defendant told him he left home on June 8 and sold fire signs in the vicinity of Rake Township. Defendant testified that on June 8 he worked Rake Township and that on June 9 he sold fire signs in Eden Township, which adjoins Rake Township. Eden Township clearly is in the vicinity of Rake Township. We have carefully compared Donahue's testimony with that of the defendant and find no material variances between Donahue's testimony and defendant's testimony with respect to the variances pointed out by the defendant or in any other particular. The testimony of Donahue in no way added to or detracted from defendant's own testimony covering the same subject matter.

■ Subsection (d) of the Act provides that if the Government fails to comply with an order to produce a statement, the court shall strike the testimony of the witness. This subsection of the statute, while not particularly applicable to the facts here since the court did not order the production of the statement, affords some assistance in determining the effect of the erroneous exclusion of a statement. We are convinced that the elimination of Donahue's testimony from

the record would have in no way influenced the verdict of the jury.

Applying the rule of Kotteakos **v.** United States, 328 U.S. 750, at page 765, 66 S.Ct. 1239, at page 1248, 90 L.Ed. 1557, we feel certain that no prejudicial error has been committed. Since Donahue's testimony as to the statements made to him by the defendant differs in no material respect from defendant's own testimony covering the same evidence, we are unable to see where the defendant could possibly gain any benefit by impeaching Donahue's testimony. If Donahue's testimony were successfully discredited, defendant's own testimony covering the same subject matter in the same way would remain. We are convinced that Donahue's testimony had no substantial bearing upon the jury's verdict.

We have carefully examined the entire record in this case. The evidence against the defendant is strong and convincing. The defendant has had a fair trial. No prejudicial errors have been committed which require a reversal.

The judgment is affirmed.