**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Salvatore ANNUNZIATO, Defendant-
Appellant.**

**No. 405, Docket 26846.**

United States Court of Appeals
Second Circuit.

Argued June 6, 1961.

Decided July 26, 1961.

Howard A. Jacobs (Stanley A. Jacobs, Jacobs, Jacobs, Jacobs & Jacobs, New Haven, Conn., on the brief), for defendant-appellant.

Harry W. Hultgren, Jr., U. S. Atty. for Dist. of Connecticut, Hartford, Conn., for plaintiff-appellee.

Before LUMBARD, Chief Judge, and GOODRICH * and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

The trial of this seemingly simple criminal case, involving an alleged violation of 29 U.S.C.A. § 186(b), which at the time made it unlawful "for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value," has raised a host of problems, to the proper solution of which the Government's seven page brief, filed, in violation of our Rule 15(a), 28 U.S.C.A. on the eve of the argument, has rendered almost no assistance.

In 1957 the Terry Contracting Company, Inc., a New York City concern, was

* Of the Third Circuit, sitting by designation.

engaged in constructing the Connecticut Turnpike in Bridgeport, using materials from outside the state. Annunziato was business agent for the International Union of Operating Engineers, members of which were engaged in work on the site. The indictment alleged two violations of 29 U.S.C.A. § 186(b) by Annunziato— the receipt of $300 on or about July 3, 1957, and the receipt of $50 on or about December 24, 1957. Prior to trial the Government filed an information charging him with the same offense stated in the second count; without objection on his part, Count 2 of the indictment was nolled and Count 1 and the information were tried together. The jury brought in a verdict of guilty on the former, of not guilty on the latter. The court gave Annunziato the maximum prison sentence, one year, and imposed a fine of $2,500 plus costs of prosecution, 29 U.S.C.A. § 186(d).

The Government's proof on Count 1 was presented primarily through five employees of the Terry company, hereafter Terry, whose testimony can be summarized as follows:

(1) *Walter Haas* was timekeeper on the Bridgeport job, identified as Job No. 719, during June and July, 1957. He worked in a trailer, with a small office at one end, the other end open, and a door between. He first saw Annunziato on an occasion when the latter said "in a very loud voice" to Van Dommellen, the Terry superintendent, and to Frattini (later identified as the master mechanic), that "The job was to be covered—the letter of the contract was to be covered by regarding the handling of all the operating machines whereby the operating local was under their jurisdiction," and that the contract would be enforced "Right to the 'T.'" A week or two later Annunziato appeared in the trailer and asked whether Mayhew, Terry's general superintendent who was located in New York, was on the job site. Haas said Mayhew was not but was expected. Mayhew arrived in the office with a Mr. Wolf, chief estimator, also from New York. When Haas saw Annunziato ap-

proaching, he left the office. He saw and heard Mayhew attempt to introduce Wolf; Annunziato declined the proffer, saying "This ain't no social call," whereupon Wolf also left the office. Haas then saw Annunziato pick up a small manila envelope from a table in the office.

(2) *Arthur Van Dommellen*, field superintendent of the Bridgeport job, recalled that late in June or early in July, 1957, Annunziato came into the trailer office and asked if someone from New York was there to see him. Van Dommellen answered "There's nobody here now, but I expect Mr. Mayhew later." Later Annunziato returned; Van Dommellen met him outside the trailer and told him Mayhew and Wolf were in the office if Annunziato wanted to see them. He did.

(3) *William ("Bill") Mayhew* was in general charge of all Terry construction projects. In June, 1957, the president of Terry was Harry Terker, deceased at the time of the trial. Mayhew was permitted to testify over objection that in the summer of 1957, on a day before he was scheduled to make a trip to New Haven, Harry Terker gave him a small manila envelope to deliver to the business agent for the operating engineers at Bridgeport. Mayhew asked the purpose; Harry Terker replied "It's for a commitment that I have made." When Mayhew demurred, Terker said, "Well, I have made the commitment, and I would like to keep up with it, and I would like you to do it, to take it with you, since you are going to New Haven." Arriving at Bridgeport, Mayhew and Wolf entered the trailer office. Annunziato came in and identified himself; Mayhew sought to introduce him to Wolf and proposed going out for a cup of coffee. Annunziato "said that he had not come for a social call; he was not interested in going for coffee." Mayhew handed the small envelope to Annunziato, who put it in his pocket. The envelope was about half an inch thick and flexible.

(4) *Ralph Cohen* was comptroller of Terry. He identified a Cash Voucher dated June 28, 1957, for $300, bearing the

name "B. Mayhew" at the top and reading "Job #719, Sundries." It also bore the legend "Receipt of above is hereby acknowledged," with Cohen's initials. If in fact Cohen had given the money to Mayhew, he would have made Mayhew sign the receipt; instead Cohen had put it in an envelope and given it to Harry Terker. Cohen was allowed to testify, over objection, that Harry Terker had told him to draw the petty cash "For Mr. Mayhew's use to pay somebody" on the job.

(5) *Richard Terker*, son of Harry Terker, had been secretary and treasurer of Terry; after his father's death he became president. He was allowed, over objection, to testify to a luncheon conversation with his father late in June or early in July, 1957. The father informed the son "that he had received a call from Mr. Annunziato" and "that he had been requested by Mr. Annunziato for some money on the particular project in question, the Bridgeport Harbor Bridge. I asked him what he intended to do, and he had agreed to send some up to Connecticut for him." Cross-examination developed that the sum of money mentioned was $250.

### Annunziato's Appearance Before the Grand Jury.

■ Appellant's first ground of appeal requires a statement of the proceedings prior to the indictment. Annunziato was summoned before a grand jury, first on September 16 and 17, 1959, and again on May 25, 1960. He claims that on neither occasion was he advised of his right to remain silent under the Fifth Amendment; and contends the indictment should therefore be quashed. We find it unnecessary to consider the legal issue, see United States v. Scully, 2 Cir., 1955, 225 F.2d 113, certiorari denied 1955, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788, since the factual premise is wanting. The transcript, which, of course, was not available to defense counsel, shows the prosecutor did advise Annunziato of his right to remain silent before taking him into the grand jury room on September

16, 1959, and on Annunziato's later appearance, he claimed the privilege with the very first question asked and repeated the claim, sustained by Judge Anderson when Annunziato was later taken before him, with every question that could possibly be incriminating.

### Voir Dire of the Panel.

■ Moving to the trial, appellant criticizes the court's refusal, on the *voir dire* of the panel, to put a question, requested by him, whether any of the panel were members of or contributors to any organization having law enforcement as its object. He relies on Beatty v. United States, 6 Cir., 1928, 27 F.2d 323 and Bailey v. United States, 5 Cir., 1931, 53 F.2d 982, holding that defendants accused of operating stills during the prohibition era should have been allowed to inquire into membership of veniremen in a prohibition enforcement society, since an affirmative answer would have supplied information permitting more effective use of peremptory challenges. We are not required to determine whether or not we would follow those cases if the question which the judge here refused to put had dealt with a special interest of the veniremen in enforcing the particular type of law under which the defendant had been indicted; Annunziato cast his net too wide. The petit criminal jury has, of course, moved from its historic origins, 2 Pollock & Maitland, History of English Law 644–656; Plucknett, A Concise History of the Common Law, 120–129, but hardly so far that government owes a defendant charged with crime an opportunity to discover whether a prospective juror has the general interest in law enforcement which is every citizen's responsibility.

### Hearsay Objections.

Our statement of the evidence has surely presaged another and more serious set of attacks—alleged violations of the hearsay rule. Appellant asserts this with respect to Mayhew's testimony that Harry Terker asked him to take the money to Bridgeport in order to keep a commitment that Terker had made to

Annunziato, to Cohen's testimony that Harry Terker told him to draw $300 "For Mr. Mayhew's use to pay somebody" on the Bridgeport job, and, most importantly, to Richard Terker's account of his luncheon talk with his father.

■ We need not tarry long over the first two statements. These fall so clearly within Professor Morgan's sixth class, "Cases in which the utterance is contemporaneous with a nonverbal act, independently admissible, relating to that act and throwing some light upon it," A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229, 236 (1922), see Beaver v. Taylor, 1863, 1 Wall. 637, 642, 17 L.Ed. 601; Lewis v. Burns, 1895, 106 Cal. 381, 39 P. 778; Shapiro v. United States, 2 Cir., 1948, 166 F.2d 240, 242, certiorari denied 1948, 334 U.S. 859, 68 S.Ct. 1533, 92 L. Ed. 1779; McCormick, Evidence (1954), pp. 586–587, that we do not need here to consider other possible grounds of admissibility.

■ Richard Terker's account seems to have been admitted on the basis that his father's luncheon statement was a declaration of a co-conspirator; the Government now seeks to sustain admissibility both on that ground and as a declaration of the father's intention. We think it was admissible on both grounds.

If the manila envelope had popped out of Harry Terker's wallet as he was settling the luncheon check and Harry had told Richard "This is money I'm sending up to Annunziato," admissibility would clearly follow from the combination, logically unassailable although practically debatable, of two principles, "that the existence of a *design* or *plan to do* a specific act is relevant to show that the act was probably done as planned" and that the plan or design may be evidenced, under an exception to the hearsay rule, "by the *person's own statements* as to its existence." 6 Wigmore, Evidence (3d ed.), pp. 79–80; Mutual Life Ins. Co. of New

York v. Hillmon, 1892, 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706. The question is whether a different result is demanded because here the declarant accompanied his statement of future plan with an altogether natural explanation of the reason, in the very recent past, that had prompted it.

We do not think such nicety is demanded either by good sense or by authority. State v. Farnam, 1916, 82 Or. 211, 161 P. 417; People v. Alcalde, 1944, 24 Cal.2d 177, 148 P.2d 627. As Professor Morgan has pointed out, Basic Problems of Evidence (1954), p. 293, the famous letter from Walters, oral evidence of which was held admissible in the Hillmon case, was actually a declaration of Walters' intention not simply to travel to Colorado but to travel with Hillmon, and the inference the jury would almost certainly draw was that this represented a previous arrangement between them.[1] Shepard v. United States, 1933, 290 U.S. 96, 103–106, 54 S.Ct. 22, 23, 78 L.Ed. 196, does not hold that a declaration of design is rendered inadmissible because it embodies a statement why the design was conceived. In that case there was no relevant declaration of design; the statement, "Dr. Shepard has poisoned me", was wholly of past fact and was offered and received as a dying declaration, erroneously as the Supreme Court held. In Mr. Justice Cardozo's words, the Government "did not use the declarations by Mrs. Shepard to prove her present thoughts and feelings, or even her thoughts and feelings in times past * * * The testimony * * * faced backward and not forward * * * at least * * * in its most obvious implications." Here the "most obvious implications" of Harry Terker's statement looked forward—he was going to send money to Bridgeport. To say that this portion of his statement is sufficiently trustworthy for the jury to consider without confrontation, but that his reference to the telephone call from Annunziato which produced the decision

1. Professor Morgan may overstate this slightly when he says "that to draw the inference that Walters went with Hillmon required an assumption that he had made an arrangement with Hillmon" before Walters wrote the letter.

to send the money is not, would truly be swallowing the camel and straining at the gnat. The "vigorous leap" with respect to the hearsay exception for declarations of state of mind was taken when this was extended from cases where "it is material to prove the state of a person's mind, or what was passing in it, and what were his intentions," Sugden v. St. Leonards, L.R. 1 P.D. 154, 251 (1876), as to which the declaration may well be the most reliable evidence attainable, to cases where the state of mind is relevant only to prove other action, where it surely is not. See Maguire, The Hillmon case—Thirty-Three Years After, 38 Harv.L. Rev. 709, 714 (1925); Hutchins and Slesinger, State of Mind to Prove an Act, 38 Yale L.J. 283, 284–288 (1929). True, inclusion of a past event motivating the plan adds the hazards of defective perception and memory to that of prevarication; but this does not demand exclusion or even excision, at least when, as here, the event is recent, is within the personal knowledge of the declarant and is so integrally included in the declaration of design as to make it unlikely in the last degree that the latter would be true and the former false.[2] True also, the statement of the past event would not be admitted if it stood alone, as the Shepard case holds; but this would not be the only hearsay exception where the pure metal may carry some alloy along with it. See 5 Wigmore Evidence (3d ed.), § 1465, and cases cited, and American Law Institute, Model Code of Evidence, Rule 509 (2), for the application of such a principle under the hearsay exception for

statements of fact against interest—an exception that would itself be applicable here but for the rather indefensible limitation that it does not relate to statements only against penal interest, see Wigmore, § 1476, American Law Institute, Model Code of Evidence, Rule 509 (1).

■ The alternative ground for admissibility is as a statement by a co-conspirator. Appellant properly makes no point that the indictment did not charge a conspiracy; it is enough if evidence, other than that whose admissibility is under challenge, disclosed one. St. Clair v. United States, 1894, 154 U. S. 134, 149, 14 S.Ct. 1002, 38 L.Ed. 936; United States v. Pugliese, 2 Cir., 1945, 153 F.2d 497, 500; People v. Luciano, 1938, 277 N.Y. 348, 14 N.E.2d 433. The serious questions are whether Annunziato and Harry Terker had the sort of common purpose that makes certain declarations of one admissible against the other and, if so, whether Terker's declaration was of the sort that falls within that rule.

■ It is quite true that mere yielding to the commission of a crime against one's self does not render a complying person a co-conspirator. Thus a woman who simply consents to be transported across a state line for the purpose of engaging in sexual intercourse is not a co-conspirator to violate the Mann Act, 18 U.S.C. § 2421 et seq., Gebardi v. United States, 1932, 287 U.S. 112, at page 123, 53 S.Ct. 35, 38, 77 L.Ed. 206, and, as there stated, "It is not to be supposed that the consent of an unmarried person to

2. The nigh impossibility of disentangling statements of plan from reasons underlying them, and the artificiality of any attempt to do so, are well illustrated by some of the decedent Whittall's statements held admissible on the issue of paternity in the celebrated case of Lloyd v. Powell Duffryn Steam Coal Co., [1914] A.C. 733, 734. Among the statements were "that Alice Lloyd had told him some things that troubled him very much but that it didn't matter because he would marry her soon enough," and that "he was afraid Miss Lloyd was in trouble—it was a case of getting married." Whit-

tall's declarations of design were admitted not, as in the Hillmon case, to prove a future act, which, indeed, Whittall admittedly never performed, but to establish a past occurrence inferably motivating the design. Perhaps, as shown in Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L. Rev. 177, 210–212 (1948), their lordships' judgments are not very luminous, but at least no one suggested that Whittall's statements must be split down the middle so as to exclude what Alice had told him and admit only the rest.

adultery with a married person, where the latter alone is guilty of the substantive offense, would render the former an abettor or a conspirator, compare In re Cooper, 162 Cal. 81, 85, 121 Pac. 318, or that the acquiescence of a woman under the age of consent would make her a co-conspirator with the man to commit statutory rape upon herself. Compare Queen v. Tyrrell, [1894] 1 Q.B. 710." We assume the same would be true of one whose sole role was that of a victim of extortion. The rationale of this is that when the legislature has imposed criminal penalties to protect a class of persons, it can hardly have meant that a member of that very class should be punishable either as an aider or abettor or as a co-conspirator.[3] In contrast, a person making a payment to a United States officer for services in relation to a matter in which the United States is interested, receipt of which 18 U.S.C. § 281 forbids, may be found guilty of conspiring with the officer receiving the payment, May v. United States, 1949, 84 U.S.App.D.C. 233, 175 F.2d 994, 1004–1005, certiorari denied 1949, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505.

▮ Determining which of these lines of authority is the more relevant here requires some analysis of the purpose of 29 U.S.C.A. § 186. This came into the statutes as § 302 of the Taft-Hartley Act of 1947, 61 Stat. 136, 157. Section 302 (a) made it "unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce." Section 302(b), previously quoted, made it similarly unlawful "for any representative of any employees" to "receive or accept" from an employer. Section 302(c) is an elaborate series of exceptions, including carefully

circumscribed ones with respect to welfare funds. These provisions existed only in very sketchy form in the Hartley bill passed by the House of Representatives, 80th Cong. 1st Sess., H.R. 3020, § 8 (a) (2) (B) and (C); the Senate removed the provisions from § 8, elaborated them, and imposed criminal sanctions, § 302(d), as well as opening the federal courts to civil suits to restrain their violation, § 302(e). Most of the discussion centered around welfare funds. Senator Ball, a majority member of the Labor Committee, declared the purpose to be that these should be "used actually for the specified benefits to the employees of the employers who contribute to them and that they shall not degenerate into bribes," 93 Cong.Rec. 4805; Senator Taft, speaking to § 302 (a), said "That is, it may be said, in a case of extortion or a case where the union representative is shaking down the employer." 93 Cong.Rec. 4876.

Decisions have recognized that § 302 (a) and (b) have this dual purpose—of protecting employers against extortion and of insuring honest representation to employees. Judge Learned Hand said, dissenting in United States v. Ryan, 2 Cir., 1955, 225 F.2d 417, 426, reversed 1956, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335, conviction affirmed on remand, 2 Cir., 1956, 232 F.2d 481, "Congress wished to prevent employers from tampering with the loyalty of union officials, and disloyal union officials from levying tribute upon employers." Other circuits have stated that "The Taft-Hartley offense is in the nature of bribery," Bianchi v. United States, 8 Cir., 1955, 219 F. 2d 182, 193, certiorari denied 1955, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249, and that "The statute is not limited in its thrust to cases of extortion * * * Congress wished to assure collective bar-

---

**3.** At least this explains the results under the Mann Act, in statutory rape, and, as we assume, in extortion; it would scarcely seem to do so with respect to adultery. However, as to that, "It is well known that the public policy of the several States differs as to criminal liability for adultery, and where a legislature has made plain its intent upon that question, prosecutors should not be permitted to circumvent that decision." May v. United States, 1949, 84 U.S.App.D.C. 233, 175 F.2d 994, 1005, certiorari denied 1949, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505.

gaining at arms length." Arroyo v. United States, 1 Cir., 1958, 256 F.2d 549, 551–552, reversed on other grounds, 1959, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed. 2d 915.

We think it follows that an employer who makes or agrees to make a payment to an employee representative forbidden by § 302(b) is engaged in a criminal enterprise jointly with the recipient. He is not simply and solely a member of the class whom the statute aims to protect; he is likewise a member of a class whose activities the statute aims to curb. The same act which constitutes an offense by the employee under § 302(b) is also one by the employer under § 302(a)—indeed, "An employer might be guilty under subsection (a) if he paid money to a representative of employees even though the latter had no intention of accepting." Arroyo v. United States, 359 U.S. at 423–424, 79 S.Ct. 864, 867, 3 L.Ed.2d 915. Harry Terker was thus a co-conspirator.[4]

That, however, is not the end of the problem. For although establishing the foregoing affords an added ground for the admissibility of Harry Terker's declarations to Mayhew and Cohen, both plainly in "furtherance" of the conspiracy, it may not with respect to Harry's declaration to Richard, whose immediate role was that of an auditor, not an actor. In Van Riper v. United States, 2 Cir., 1926, 13 F.2d 961, 967, we said that "merely narrative declarations [of a conspirator] are not competent," and in United States v. Goodman, 2 Cir., 1942, 129 F.2d 1009, 1013, we held it error to have admitted what "were merely narrative declarations of a past fact," even though made while the conspiracy was continuing. See United States v. Compagna, 2 Cir., 1944, 146 F.2d 524, 530,

certiorari denied 1945, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422; United States v. Pugliese, supra, 153 F.2d at page 500. In contrast, the Seventh Circuit construes the expression "in furtherance of the conspiracy" as referring "not to the *admission* as such, but rather to the *act* * * * concerning which the admission or declaration is made," International Indemnity Co. v. Lehman, 1928, 28 F.2d 1, 4, certiorari denied 1928, 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 561, a ruling which Morgan has characterized as "employing a time-honored judicial device to make new law without appearing to neglect, much less to abuse, the doctrine of stare decisis," Admissions, 12 Wash.L. Rev. 181 (1937) in A.A.L.S. Selected Writings on Evidence and Trial (1957), 825, 835; and such an extension of the rule is proposed in the American Law Institute's Model Code of Evidence, Rule 508(b), and approved by Professor Mc-Cormick, Evidence (1954 ed.), pp. 522–523. See Note, Developments-Conspiracy, 72 Harv.L.Rev. 920, 985–986 (1959). We think Harry Terker's statement to his son was admissible even under the historic view of this Circuit. The statement was not a "merely narrative declaration of a past fact." Even the instant payment to Annunziato lay in the future; moreover, it might well have been important to Harry's objectives that his son, then secretary-treasurer and later president of the company, should know of his father's policy if questions should ever arise or if a similar problem with respect to Annunziato should be presented in the future.

To round out this discussion we add there was ample evidence, other than Harry's statement to Richard, to show the common plan; the judge needed only

---

4. We do not think it necessary to decide whether if Annunziato and Harry Terker had been the only persons here involved, the "Wharton rule" would have prevented prosecution for conspiracy, see Note, Developments—Conspiracy, 72 Harv.L. Rev. 920, 953–956 (1959), or, if it would, whether that would make the declaration of one participant inadmissible against another. We cannot see why the latter should be so; the basis of admissibility is a joint enterprise, whether technically a "conspiracy" or not, see American Law Institute, Model Code of Evidence, Rule 508(b). In any event the Wharton rule would not be applicable here, since at least two persons other than the payor and the receiver, namely, Mayhew and Cohen, knowingly participated in the criminal enterprise.

enough "to decide whether, if the jury chose to believe the witnesses," Harry Terker and Annunziato were engaged in one, United States v. Pugliese, supra, 153 F.2d at page 500.

Jencks Act and Grand Jury Minutes.

This case furnishes further proof, if any were needed, of the prophetic truth of Mr. Justice Frankfurter's observation concerning 18 U.S.C. § 3500, "The possible permutations of fact and circumstances are myriad." Palermo v. United States, 1959, 360 U.S. 343, 353, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287.

█ (1) The witness Haas has been twice interviewed by the Government, on September 24, 1958, and shortly before the trial in the fall of 1960. On the latter occasion he signed a three page statement, which was delivered to the defense. It is unquestioned that at his first interview he did not sign or otherwise adopt or approve any statement; the controversy is whether an Interview Report dictated by F.B.I. Special Agent Clemente on September 25, 1958, the day after the interview, and forwarded under date of September 29, came within § 3500(e) (2).

The Interview Report, of slightly more than three single-spaced typewritten pages and some 800 words, was turned over to the judge, who permitted defense counsel to examine Haas in regard to it in the absence of the jury. Haas testified that at the September 24 interview the F.B.I. agent made notes; that the interview "possibly" lasted about three hours; and that on his 1960 interview he was not shown either the notes made in September, 1958, or the Interview Report, although the agents had "certain papers in front of them" to which they referred. Defense counsel made no request for the calling of Agent Clemente. The judge announced he would adhere to a ruling, made prior to the detailed examination of Haas, that, under the Palermo decision, the Interview Report need not be produced.

Examination of the Interview Report in the light of the testimony does not leave us with a clear conviction whether or not the report came within § 3500(e) (2), see United States v. McKeever, 2 Cir., 1959, 271 F.2d 669, 673–675. On the one hand, "the statute was meant to encompass more than mere automatic reproductions of oral statements"; on the other, "summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions." 360 U.S. at pages 352–353, 79 S.Ct. at page 1225. Here the agent did have notes, how complete we do not know, and the Interview Report at least purports to be solely a statement of what Haas said. Selective it must have been if the interview in fact had lasted about three hours; hence, even though the word-time ratio is slightly higher than in Palermo, 360 U.S. at page 355, footnote 12, 79 S.Ct. 864, it is hardly "a substantially verbatim recital of an oral statement" if that requires not only correctness but a completeness that would include the immaterial and the trivial as well as the pertinent. The obvious way to help resolve these doubts would have been to call Agent Clemente, at least if he was available, Campbell v. United States, 1961, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428.

Whether the Campbell decision means that, under circumstances such as here presented, the judge was required to ascertain the availability of the F.B.I. agent and require his production if available, even though, in contrast to Campbell, 365 U.S. at page 94, 81 S.Ct. 421, this was not even suggested by defense counsel, is a serious question—perhaps he might be since, as it is all too easy to forget, the judge had a knowledge of the nature of the Interview Report which defense counsel did not. We do not feel called upon to resolve that issue here. Careful scrutiny of the Interview Report convinces us that on no basis could it have assisted the defense. Both the majority and the minority opinions in

Rosenberg v. United States, 1959, 360 U.S. 367, 371, 375, 79 S.Ct. 1231, 1236, 3 L. Ed.2d 1304, spurn the extreme view "that the harmless error doctrine can never apply as to statements producible under the statute, see Bergman v. United States, 6 Cir., 253 F.2d 933; United States v. Prince, 3 Cir., 264 F.2d 850." [5] Even taking as our test the presumably more rigid standard laid down by the minority in Rosenberg, 360 U.S. at pages 375–376, 79 S.Ct. at page 1236, that we must remand "unless the circumstances justify the conclusion that a finding that such a denial [of a statement producible under § 3500] was harmful error would be clearly erroneous," we answer that here it would be, fully recognizing, as we say this, the caution that "appellate courts should be hesitant to take it upon themselves to decide that the defense could not have effectually utilized a producible statement." The Interview Report checks fully with Haas' trial testimony. Had we been defense counsel, we would have bitterly regretted receiving it, since its production would have presented the dilemma, which trial lawyers strive desperately to avoid, that examination on the report would only reinforce the witness' testimony whereas failure to use it would do the same. Beyond this, Haas' testimony as to the delivery of the envelope was corroborated both by Mayhew, whose testimony was even more direct, and, in some degree, by Van Dommellen. Applying the test of harmless error, 28 U.S.C. § 2111, laid down in Kotteakos v. United States, 1946, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557, we pronounce this to have been such, Karp v. United States, 8 Cir., 1960, 277 F.2d 843, 849, certiorari denied 1960, 364 U.S. 842, 81 S.Ct. 80, 5 L.Ed.2d 65— if error it was.

(2) Richard Terker testified he was first interviewed by the F.B.I. in the fall of 1958. The interview lasted "About two, two and a half hours," the agents made longhand notes, and Richard looked at them at the end of the interrogation. To the question whether the notes were accurate and correct, he answered "I would imagine so, yes." When defense counsel asked for production of the notes, the prosecutor responded, "I have no notes, your Honor, by the term 'longhand notes' as alluded to in this testimony. We do have, as has been developed in the testimony of other witnesses, the F.B.I. memorandum of the interview." Defense counsel then gave "notice * * * to produce the longhand notes that were taken on questioning the witness, and the witness read over and consented to"; the judge noted the prosecutor's statement "that no such notes are in his possession." There followed a conference at the bench, as to the content of which the transcript does not inform us.

Terker's testimony created at least a prima facie case that the longhand notes were "a written statement * * * otherwise adopted or approved by him" within § 3500(e)(1). Hence, if defendant had sought the memorandum of the interview mentioned by the prosecutor, he should have been given it for use as secondary evidence of the contents of the destroyed notes, see United States v. Thomas, 2 Cir., 1960, 282 F.2d 191, 193–195, or perhaps, if facts elicited on an inquiry warranted, as independently producible under § 3500(e)(2). However, defendant made no such request and the point is thus foreclosed.

(3) Richard Terker had testified briefly before the grand jury on May

---

5. In the light of this ruling by the Supreme Court, we have no occasion to consider whether there is a sufficient basis for distinguishing, as regards 28 U.S.C. § 2111, error in the denial of a statement producible under the Jencks Act from error in a failure of the judge to read the minutes of grand jury testimony of a government witness and to make available to the defense any portions containing inconsistencies, or the different views as to the latter that have been expressed by judges of this Court, see United States v. Giampa, 2 Cir., 1961, 290 F.2d 83 and United States v. Hernandez (on petition for rehearing), 2 Cir., 1961, 290 F.2d 86.

25, 1960. At defendant's request the judge examined the minutes of this testimony for possible inconsistencies, in accordance with the procedure directed in United States v. Spangelet, 2 Cir., 1958, 258 F.2d 338; United States v. Zborowski, 2 Cir., 1959, 271 F.2d 661, 666; and United States v. Hernandez, 2 Cir., 1960, 282 F.2d 71, on rehearing, 2 Cir., 1961, 290 F.2d 86. Finding no inconsistencies, he declined to make the minutes available to the defense. We have reviewed the minutes and likewise find none.

Affirmed.