**UNITED STATES of America,
Appellee,**

v.

**John Joseph FRANK et al., Defendants-Appellants.**

**Nos. 578–581, Dockets 73–2384, 73–2425, 73–2495, 73–2408.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 20, 1973.

Decided Feb. 25, 1974.

the Southern District of New York, and S. Andrew Schaffer, Asst. U. S. Atty., of counsel) for appellee.

Louis Bender, New York City, for defendant-appellant Frank.

Arthur Karger, New York City, for defendant-appellant Hemlock.

Herald Price Fahringer, Buffalo, N. Y., for defendant-appellant Hoffer.

John M. McGillicuddy, New York City, for defendant-appellant Borgman.

Before FRIENDLY, HAYS and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

Count 1 of this indictment in the District Court for the Southern District of New York charged the four appellants [1] with conspiring, 18 U.S.C. § 371, to violate the statutes relating to mail fraud, 18 U.S.C. §§ 1341–1343, and interstate or foreign transportation of stolen money, 18 U.S.C. § 2314. Counts 2 through 5 charged appellants with the substantive offense of interstate or foreign transportation of two certified checks in violation of § 2314. Counts 6 and 7 charged them with violating 18 U.S.C. § 1342 by using fictitious names in carrying out a scheme to defraud by mail. Counts 8 through 16 charged them with unlawful use of mail and wire communication facilities in violation of § 1341 and § 1343.[2] The jury returned guilty verdicts against all appellants on the conspiracy and fictitious name counts. Frank, Hemlock and Hoffer were found guilty on the unlawful transportation counts. Hemlock and Hoffer were found guilty on two of the mail fraud counts. The jury acquitted on the remaining counts. The judge imposed substantial prison sentences on all defendants and a $10,000 fine on Hemlock.

## I. *The facts*

The case concerns a fraud allegedly perpetrated on Mrs. Marie Dominguez,

W. Cullen MacDonald, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for

---

1. The indictment also named as co-conspirators A. Arthur Kay and Maurice S. Hebert, who are unarrested fugitives.

2. Judge Pollack did not submit counts eight, eleven and sixteen to the jury but dismissed them at the close of the Government's case.

the then 28-year-old daughter of former President Rafael Trujillo of the Dominican Republic. Since appellants all challenge the sufficiency of the evidence to warrant submission to the jury, it is necessary to summarize the evidence presented against each defendant. Taken in a light favorable to the Government the facts are as follows:

In the summer of 1967, Mrs. DeLeon, as Mrs. Dominguez then was, left her husband's home in Madrid and came to this country with two of her children. Apparently because her property was the subject of confiscation decrees by the Dominican government, she had placed it in the name of a number of corporations in countries with bank secrecy laws. One of these, a Luxembourg corporation called Plaininvest, held a $2.4 million certificate of deposit in the London offices of the Bank of London and South America.

When she arrived in this country, Mrs. Dominguez was met at the airport by defendant John Joseph Frank, an attorney with an office in Washington, D. C., and a former agent with the F.B.I. and the C.I.A. Mrs. Dominguez' husband had engaged Frank to obtain an entry visa for her, apparently because he had provided security services for the Trujillo family in the past. Frank was accompanied by defendant Borgman, whom he introduced as "Steve Miller," the name we shall also use.

Shortly thereafter, Frank and Miller introduced Mrs. Dominguez to defendant Hemlock, a New York attorney with whom defendant Hoffer was associated. Hemlock agreed to participate in a ruse for the benefit of Mrs. Dominguez whereby, under the pretext of a business negotiation, he would divert her previous husband, Mr. DeLeon, from Madrid to Barcelona, while she took possession of certain of her belongings in the family home in Madrid. The plan succeeded. In September Hemlock and Hoffer began to advise Mrs. Dominguez

on a property settlement with her husband, from whom, with the aid of Frank and Miller, she had obtained a Mexican divorce. In the course of this, they learned of Plaininvest. Hemlock and Mrs. Dominguez instructed the London bank to transmit interest payments to her personal account at the Bank of New York and to send all communications relating to the Plaininvest account "in care of Hemlock, List, Hoffer & Becker, Esqs." at their New York office. In October, on the advice of Frank and Miller, she opened a second account, at the New York branch of the Bank of London and South America. That account was opened in the name of Plaininvest, "c/o John J. Frank, 1500 Massachusetts Avenue, Washington, D.C." Mrs. Dominguez signed one signature card for the account, and Frank and Miller signed a second card to enable them to request statements, deposit slips, checks or a balance relating to the account.[3] During the fall of 1967, Frank and Miller largely took over the conduct of Mrs. Dominguez' day-to-day financial affairs. They had custody of her checkbook, they prepared batches of checks for her signature, and they cashed checks for her at the banks.

Sometime during that fall, Frank and Miller began to recommend that Mrs. Dominguez invest in foreign land, avowedly to avoid loss in the devaluation of the dollar—advice that proved to be wise, although premature—and to avoid high United States taxes. After an adverse reaction from Mrs. Dominguez' brother, Frank and Miller returned to the charge with a recommendation specifically suggesting that she buy Canadian land. According to Mrs. Dominguez, Miller insisted that Canada was booming and that a land purchase there "would be a wonderful investment." Mrs. Dominguez agreed to consider any specific property that they might suggest, but specified that in no event was she willing to spend more than $200,000.

---

3. On the Government's theory of the case, this account served no purpose save as a vehicle for subsequent frauds.

Mrs. Dominguez' limited acquiescence provided an entry for the Canadian land manipulations through which the fraud was sprung. On January 9, 1968, a Dr. George C. Hori sold a parcel of land in the northeastern part of Montreal. The price of the land was $79,000, of which $22,000 was to be paid him in cash and the balance was to be used to clear existing mortgages. The deed, executed in the office of a notary, Maitre Elie Solomon, named as the purchaser A. Arthur Kay, one of the two unarrested co-defendants named in the indictment. The parties instructed the notary to hold the deed pending payment into his trust account for disbursement to Dr. Hori and the mortgagees. The notary asked Kay for the names of the Bahamian company to which Kay was planning to resell the land and of the European company to which it would be resold again; Kay said the information would come in a call from New York. Several hours later, Mtre. Solomon received such a call; he was not sure whether it was from Hoffer or Hemlock.[4] The caller said the first name of the Bahamian corporation was "Columbia"; the rest of the information would be supplied the next day in the Bahamas. The notary in turn requested that the caller procure a resolution from the ultimate purchaser authorizing the purchase. He dictated a proposed resolution that would meet the requirements for effecting the transfer.

On January 10, Mtre. Solomon, Kay, co-defendant Maurice S. Hebert, and an attorney, Irving L. Adessky, flew from Montreal to Kennedy Airport in New York City. At the same time Miller had the New York branch of the Bank of London and South America certify a Plaininvest check for $778,500 to Columbia Corporation Ltd.[5] Hemlock, inferably with the check in hand, joined the Montreal party at the airport, whence they flew to the Bahamas, where Hoffer was awaiting them.

The next day the entire group met with a Bahamian attorney, Anthony Hepburn, and his secretary, Celia Neill. Kay signed a deed transferring the property to Columbia, which was represented by Hepburn and Neill, its vice-president and assistant secretary. The further transfer from Columbia to Plaininvest was delayed because neither Hemlock nor Hoffer had brought a Plaininvest resolution authorizing anyone to execute the deed of purchase. While the group was waiting for the arrival of the resolution, Hoffer, in Hemlock's presence, informed Mtre. Solomon that Plaininvest would be represented by one Herbert M. Lefkowitz as agent but that the deed should refer to Plaininvest in care of Frank at his Washington, D.C. office; Hoffer also promised to send Solomon certified copies of the charters of Columbia and Planinvest.

A man identified as Lefkowitz appeared at around 1:30 p.m. He produced a resolution which the notary said was substantially what he had dictated to either Hoffer or Hemlock in their telephone conversation two days before. The resolution recited that at a meeting in New York on January 9, Plaininvest had authorized the purchase of the property from Columbia for $1.00 and other good and valuable consideration and had designated Lefkowitz to sign the deed; the document purported to be certified by Mrs. DeLeon as President and Secretary. The notary thereupon authorized

---

4. Solomon testified on direct examination that the call from New York had come from "a gentleman who identified himself as Mr. Harry Hoffer." The court subsequently struck out his direct testimony concerning the telephone call for lack of foundation, but counsel for Hoffer on cross-examination elicited from Solomon that before the grand jury he had testified that he had received a call from "either Mr. Hemlock or a member of his firm."

5. The check is signed in the name of Angelita De Leon (the name Mrs. Dominguez used during her first marriage), as President of Plaininvest; the Government did not dispute that the signature was hers. The basis for the certification was a telexed transfer of $780,000 from the main office in London. The record is silent on who directed the transfer.

execution of the deed from Columbia to Plaininvest. However, since he had not received the $79,000 required to clear the initial transaction, the notary refused to release the certified copy of the deed from Columbia to Plaininvest. The meeting then adjourned pending the arrival of the funds.

During the same day, January 11, Hemlock and Hoffer met with the Nassau branch manager of the First National City Bank (FNCB), Michael Latvis. They opened accounts for Columbia and for Splindian Investments Limited, another Bahamian corporation. The accounts provided that withdrawals could be made only with the authorization of Hemlock, Hoffer and Frank. Hemlock and Hoffer signed the signature card at that time; Frank's signature was obtained later. Hemlock and Hoffer then presented the $778,500 check from Plaininvest to Columbia and arranged for a portion of this to be kept in a time deposit.[6] Notwithstanding the certification, FNCB would not extend immediate credit until the check had been accepted for clearance at the Federal Reserve Bank at New York, a procedure which would normally take eight days. Hoffer and Hemlock suggested the dispatch of a messenger to expedite clearance of the check. Latvis' secretary, Miss Elizabeth Reilly, volunteered for the trip, for which Hoffer and Hemlock made the arrangements.

Miss Reilly presented the check for processing at FNCB in New York around 10:30 a. m. on July 12. That same morning Hemlock, Hoffer, Kay and Hebert met with the notary and Adessky in Nassau; either Hemlock or Hoffer gave Adessky and the notary $500 apiece as compensation for their services. The two lawyers then left for New York. Later Kay took the notary to the Nassau branch of FNCB, where the transfer of $79,000 to the notary's trust account in Montreal was arranged.

The notary flew the next day to New York; by prearrangement Hoffer met him at the airport and received a "special copy" of the deed from Columbia to Plaininvest.[7] On January 15 Hoffer sent Solomon a copy of Columbia's charter, showing it had been incorporated on November 27, 1967.

Shortly thereafter, Miller told Mrs. Dominguez she had purchased land in Canada. After she protested that she had authorized only inquiry and not action, Frank came into the room. Miller asked if she remembered signing "the check"; she did not. Frank then advised her not to worry and assured her that "everything is all right." In answer to a question concerning the cost of the property, he answered that it was "within the limits" she had previously set. Sometime later, Miller showed her some clippings from U.S. News & World Report and the Wall Street Journal that reported new mineral explorations in various parts of Quebec. Miller told her that the discoveries had already caused her tract of marshy, swampy land near Montreal to appreciate.

About a week after the first transaction, Kay inquired whether the notary would be interested in arranging for the sale of some 150,000 square feet of a farm owned by a corporation in which the notary held a minority interest, for no more than $8,000. When Solomon expressed reluctance to proceed with the transaction before hearing from Hemlock or Hoffer, Kay paid him $500 to cover the notarial fees and the preliminary costs of subdivision. The notary thereupon began making arrangements for the sale.

Kay subsequently told the notary that the scenario for the second transaction would resemble that for the first, save for a few changes in names. This time Denise Comeau would take Kay's place as the first purchaser and Splindian, whose charter he delivered to the notary,

---

6. Latvis testified that time deposits were available on a 30- and 90-day basis and that to the best of his memory, the deposits in question were placed on a 90-day basis.

7. The "special copy" differed from the deed that was delivered in that it did not contain a copy of the resolution but merely referred to a duly authorized resolution.

would be the second. Meanwhile, Mtre. Solomon received a copy of the Plaininvest charter from Hoffer; he was disturbed to discover that Plaininvest was not expressly empowered to buy and sell land as required by Canadian law, and asked for a copy of the Luxembourg laws that might aid in implying the requisite power. Hoffer never supplied the Luxembourg statutes or any other proof that Plaininvest could engage in Canadian real estate transactions.

Miller told Mrs. Dominguez around this time that a very good piece of land in Canada was being sold for tax reasons at less than its worth. She at first demurred, saying that she was unwilling to buy any more land in Canada. Miller then telephoned Frank in her presence and said, "John, she doesn't want to buy the land." After that conversation, Miller once again urged her to consent to the purchase. Finally, she agreed to consider the land, but she insisted that Miller first send a letter to the Bank of London and South America requesting three different bank appraisals. Miller typed the letter as instructed, but Mrs. Dominguez testified that she never received any response from the bank.

On February 2, 1968 Miller presented to the New York branch of the Bank of London and South America a Plaininvest check in favor of Splindian in the sum of $361,500, which the bank certified in consequence of a prior transfer of that sum from London. Two days later the notary, Adessky, Kay and Denise Comeau flew to New York. Hemlock joined them, inferably with the certified check in hand, and the group flew on to Nassau where Hoffer was awaiting them.

The following morning the group met with Hepburn, Miss Neill and Lefkowitz for the second closing. The deeds from Solomon's corporation to Miss Comeau and from her to Splindian, acting through Hepburn and Neill, were promptly executed. Although Hoffer supplied no evidence that Plaininvest was empowered to purchase foreign real estate, as the notary had requested, the deed from Splindian was executed by Hepburn and Neill, and accepted for Plaininvest by Lefkowitz. Hemlock and Hoffer went on to the FNCB, made a time deposit in Splindian's account, and arranged for Miss Reilly to make another trip to New York to expedite the clearance of the Plaininvest check. Shortly thereafter Kay paid Solomon $10,856 for the land; $2,856 of this was rebated to Kay upon their return to Montreal.

In February or March, 1968, Arcadio Santana, a former family accountant, left the employ of Mrs. Dominguez' former husband and joined her in New York. She asked him to ascertain from Frank and Miller the precise amount of money that Plaininvest had spent on the one acquisition of which she was then aware. Apparently Santana learned that $778,000 had been paid; when Mrs. Dominguez taxed Frank with this, he once again urged her not to worry and assured that it was "a good piece of land" and that it was worth the price she had paid for it. Shortly thereafter, Hemlock, Hoffer and Frank went to the FNCB in Nassau and asked Latvis to break the time deposits and pay them out in cash, which he did. Since the bank records were not available at the trial because of the Bahamian bank secrecy laws, he could testify only that they withdrew "a large amount, perhaps from 300 to $600,000, $300,000 to $600,000." Also during March, 1968, Frank gave Mrs. Dominguez the special copy of the deed to the Hori tract, see note 7; when she asked him to explain the nominal consideration of one dollar, he called in Miller, who told her that such recitations were usual in Canada.

Unsatisfied with Frank's explanation of the large expenditure, Mrs. Dominguez and her new husband met with Hemlock that June at her home in Queens. The couple gave Hemlock the special copy of the deed and requested that he investigate the transaction. Mrs. Dominguez testified that she

thought Hoffer was present at that meeting but could not be certain.[8] Further meetings were held through the summer, primarily for the purpose of discussing Mrs. Dominguez' tax returns which were being prepared by a tax specialist recommended by Hemlock and Hoffer. At one meeting Mrs. Dominguez expressed concern about the Canadian property being in the name of Plaininvest, which she thought was not supposed to own land directly. Neither Hoffer nor Hemlock revealed their previous exposure to this problem or the purchase from Maitre Solomon. As time passed without the receipt of a report on the initial purchase from Hemlock and Hoffer, Mrs. Dominguez dispatched Santana to Montreal. Early in September, 1968, at a meeting attended by Hemlock, Hoffer and others, she told Hemlock she had learned that he had been in Canada several times making arrangements for the purchase of the lot; he replied "I smell a rat" and "I think somebody has been using my name,"[9] but did not reveal what he in fact knew. She also told Hemlock she had been informed that the lot wasn't worth what was paid for it; Hemlock responded by proposing to set up a meeting with Frank and Miller.

This meeting occurred on September 24 at Hemlock's office. Its first phase was attended by Mrs. Dominguez, Frank, Miller and Hemlock.[10] This time Frank and Miller admitted that the land was not worth what had been paid, but they explained that the difference had been used to pay off the C.I.A. because she had been involved in activities to kill one of her father's assassins. Miller and Frank then left. Mr. Dominguez entered and Hemlock repeated what they had said. In the course of the meeting, Hemlock told Mr. and Mrs. Dominguez nothing about the many other circumstances of the two transactions of which he was aware. Subsequently, Mrs. Dominguez obtained other counsel who began a civil action on her behalf in the District Court for the Southern District of New York against Frank, Miller and Hemlock.

## II.  *Sufficiency of the Evidence*

■ Putting aside for the moment defendants' legal attack on the charges relating to the fictitious name statutes, 18 U.S.C. § 1342, we think Frank's and Miller's claims of insufficiency are so palpably devoid of merit as not to warrant extended discussion. They were the instigators of the scheme to expend $1,140,000 of Plaininvest's funds for land that had been purchased for a total of $89,000, and one or the other or both participated in every phase of the plot. All this is crowned by their admission at the final meeting with Mrs. Dominguez that, contrary to their prior assertions, the land was not worth what they paid for it.

■ Hemlock and Hoffer claim that the evidence is consistent with their having simply engaged in professional activities and that any wrongdoing was solely Frank's and Miller's. Hoffer makes the further argument that he was acting in a subordinate capacity and thus was even farther than Hemlock from the odoriferous stream of guilty knowledge. But too many red flags were flying to make these contentions plausible. It is useful to recall Judge Learned Hand's observation that "the cumulation of instances, each explicable only by extreme credulity or professional inexpertness, may have a probative force immensely greater than any one of them alone." United States v. White, 124 F.2d 181, 185 (2 Cir. 1941). We repeat also that lawyers cannot "escape

---

8.  Mrs. Dominguez testified that although she could not recall which of the summer meetings Hoffer attended, she was certain that he had been at most of them.

9.  The record contains no evidence that Hemlock had made such trips.

10.  Hemlock had endeavored to persuade Mrs. Dominguez to come without her husband. After this failed, he did prevail on the husband to wait outside his office.

criminal liability on a plea of ignorance when they have shut their eyes to what was plainly to be seen," United States v. Benjamin, 328 F.2d 854, 863 (2 Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964). See also United States v. Sarantos, 455 F.2d 877, 880–882 (2 Cir. 1972), and cases there cited. If Hemlock and Hoffer were acting as attorneys, their client was Plaininvest, which they knew to be simply Mrs. Dominguez in an incorporated form. Yet there is no indication that they ever advised her about the seemingly needless interposition of Columbia and Splindian, that they ever made the slightest inquiry concerning the relationship between the large Plaininvest certified checks and the modest price which they knew was paid to the Canadian owners, or that they ever notified Mrs. Dominguez that the second transaction had occurred at all. Perhaps the most damaging evidence against them was their personal participation with Frank in the breaking of the time deposit just after Frank had learned that the jig might be beginning to be up. Whether or not they received any portion of the proceeds, they had beheld Frank walking out of the FNCB in Nassau with $300,000 to $600,000 in cash generated by the Plaininvest checks to Columbia and Splindian. Six months later, and three months after Mrs. Dominguez had instructed them to investigate the first transaction, they had revealed nothing. Their silence throughout the summer, in light of their intimate familiarity with many of the details of the two purchases, makes their claim of innocence highly implausible. Hemlock's efforts to prevent Mr. Dominguez from attending the showdown on September 23 and his bland reaction to a revelation by Frank and Miller that would have caused an honest lawyer to erupt in fury are the final straws as far as he is concerned.

In passing on the sufficiency of the evidence, the court had only the prosecution's case, the defense having offered none. To be sure, the defendants were not required to testify or to present any case at all, and the jury could not permissibly draw an adverse inference simply from their failure to take the stand. But the self-incrimination clause does not elevate a defendant's silence, much less the failure to present any defense case, to the level of a convincing refutation. When a defendant has offered no case, it may be reasonable for a jury to draw inferences from the prosecution's evidence which would be impermissible if the defendant had supplied a credible exculpatory version.[11] The test of sufficiency in criminal cases is "whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 232–233 (Prettyman, J.), cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L. Ed. 1850 (1947), approved in United States v. Taylor, 464 F.2d 240, 242–245 (2 Cir. 1972). That test was met here not only as to Frank and Miller but also as to Hemlock and Hoffer.

### III. *The "fictitious name" statute*

The fictitious name statute, originally adopted in 1889, 25 Stat. 873, and codified as part of Chapter 63 of Title 18 relating to Mail Fraud, reads as follows:

Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own

---

11. Appellate counsel for Hoffer suggests that the decision of trial counsel not to call this defendant was based simply on a belief that, despite the contrary ruling of the trial judge, the Government had not presented a sufficient case to warrant that course. Perhaps so, but the defendant is bound by the strategy that was chosen.

proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

It is not entirely clear what advantage the Government derives from invoking this statute, particularly in a mail fraud case where there is a conspiracy charge, since it applies only when the prosecution has established a "purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business." Be that as it may, the Government did invoke it here and, if it did so erroneously, there would have to be a reversal not only of the convictions under Counts 6 and 7 but perhaps also of the conviction on the conspiracy charge, Count 1, since the judge instructed that a finding of a conspiracy to violate § 1342 would warrant a conviction on the conspiracy count.[12]

█ Defendants say there was no evidence that any participant used or assumed or requested to be addressed by any fictitious, false or assumed name. Not disputing the literal truth of this,[13] the Government contends that the statute should not be read so narrowly but

should be construed to cover a situation where persons having no substantive interest, e.g., Kay, Miss Comeau, Columbia, Splindian, Hepburn and Miss Neill, are inserted into a fraudulent transaction for the sake of concealing the identities of the true beneficiaries of the scheme, even though the individuals and corporations are using their actual names. This construction seems reasonable. It was essential to the fraud that the purchasers on the second round should not be Frank and Miller, or even corporations in which they appeared to have an interest. In that sense the defendants did utilize an identity other than their own to conceal their role in the fraud.[14] Such meagre case law as exists seems to support the application of § 1342 to facts such as these, in result if not in discussion. See e.g., United States v. Kyle, 257 F.2d 559 (2 Cir. 1958), cert. denied, 358 U.S. 937, 79 S. Ct. 327, 3 L.Ed.2d 308 (1959); United States v. Baren, 305 F.2d 527 (2 Cir. 1962); Atkinson v. United States, 344 F.2d 97 (8 Cir.), cert. denied, 382 U.S. 867, 86 S.Ct. 141, 15 L.Ed.2d 106 (1965); cf. United States v. Ellicott, 336 F.2d 868 (4 Cir. 1964).

## IV. *Alleged receipt of inadmissible hearsay*

Two complaints are made with regard to the receipt of allegedly inadmissible hearsay.

---

12. We say "perhaps" because a conviction of conspiracy to violate § 1342 under the circumstances of this case arguably would include a finding of conspiracy to violate § 1341. United States v. Jacobs, 475 F.2d 270, 282–284 (2 Cir. 1973); United States v. Alsondo, 486 F.2d 1339, 1347 n. 5 (2 Cir. 1973) (on rehearing).

13. The Government does not urge that defendant Borgman's use of the name Miller satisfies the statute; apparently Borgman had been calling himself Miller for some time and Mrs. Dominguez was in no way deceived by this. It does urge that the jury could properly have found that "Lefkowitz" was not that shadowy individual's real name. We doubt there was sufficient evidence of this.

14. The fact that the name used by the defendant belongs to a real person has long been held insufficient to avoid the reach of § 1342. It is the defendant's use of a name other than his own to obscure his identity that constitutes the offense. United States v. Etheredge, 140 F. 376, 380 (N.D.Ala. 1905). Prosecutions for fraudulent misuse of credit cards have typically involved the use of names of real persons. See, e. g., United States v. Bonanno, 430 F.2d 1060 (2 Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970); United States v. Chason, 451 F.2d 301 (2 Cir. 1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1291, 31 L. Ed.2d 479 (1972); United States v. Madison, 458 F.2d 974 (2 Cir.), cert. denied, 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972).

The first, relating to certain statements of Kay to the notary, need not detain us long. Apart from the point that there may well have been sufficient evidence to link Kay with the conspiracy under the standard prescribed in United States v. Geaney, 417 F.2d 1116, 1119–1120 (2 Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970),[15] our attention has not been called to any statement of Kay's that was received to prove the truth of a matter asserted in the statement. Instead, his remarks served only to prove his knowledge of facts otherwise established or to shed light on his several transactions with the notary. See United States v. Annunziato, 293 F. 2d 373, 376–377 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); United States v. Costello, 352 F.2d 848, 853–855 (2 Cir. 1965), rev'd on other grounds sub nom. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); McCormick, Evidence § 249 (Cleary ed. 1972). No matter how often appellate courts and commentators seek to explicate the true nature of the rule, the notion that any reference to a conversation constitutes hearsay, inadmissible unless within an exception, dies exceedingly hard.

A more troubling question concerns the admissibility against Hemlock and Hoffer of the admissions by Frank and Miller at their final meeting with Mrs. Dominguez. The serious argument here is not that there was inadequate proof *aliunde* of the conspiratorial relation among the four men but that the admissions were not in furtherance of an on-going conspiracy.[16]

We have little difficulty in holding that despite Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), Lutwak v. United States, 344 U. S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), and Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the conspiracy to defraud Mrs. Dominguez was continuing as late as September 24. The basis of *Krulewitch* was "that the central aim of the alleged conspiracy—transportation of the complaining witness to Florida for prostitution—had either never existed or had long since ended in success or failure when and if the alleged co-conspirator made the statement attributed to her," 336 U.S. at 442, 69 S.Ct. at 718; the Court rejected the argument "that even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment [from the government] as its sole objective." 336 U.S. at 443, 69 S.Ct. at 718. *Lutwak* and *Grunewald* added nothing more, although Mr. Justice Harlan's opinion in the latter is useful for its explication, 353 U.S. at 402, 77 S.Ct. at 972:

> Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators.

Here the conspiracy could well be regarded as not simply to perpetrate the

---

15. This is an appropriate place to note and reject the argument that the Government's proof failed because the excess of the amount paid by Plaininvest over that received by Dr. Hori and Mtre. Solomon may have gone to Kay, rather than to the defendants. If Kay was a fellow conspirator, that would be immaterial. Moreover, there was ample evidence that the large sums remaining in the Nassau branch of FNCB were accessible to Frank, Hemlock and Hoffer rather than to Kay, and were removed by them.

16. The Government claims that no objection was made to the admission of this testimony; the defendants counter that the judge had ruled that he would provisionally admit all declarations of alleged conspirators subject to a subsequent blanket motion to strike evidence the admission of which was not warranted under the conspiracy exception and that such a motion was made. While we appreciate the judge's desire to expedite the trial, we are not sure of the wisdom of departing so far from the requirement of specific and reasoned objection to a particularly crucial piece of evidence.

two frauds here described. The evidence suggests that the conspirators thought they had a good thing in Mrs. Dominguez and would defraud her further if the opportunity arose. More important, the conspiracy even as to the two parcels was not complete so long as Mrs. Dominguez was threatening to get the money back.

■ There is more of a problem in holding that the declaration was in *furtherance* of the conspiracy, a requirement to which we have adhered, United States v. Annunziato, *supra*, 293 F.2d at 380. If Frank and Miller had simply admitted the overpayment, we would see no basis for such a ruling. However, they went beyond this and offered an explanation which they apparently thought, with however little basis, would turn away Mrs. Dominguez or at least diminish her ire and the consequent zeal of her pursuit. In any event, although no one has made the point, we do not see why the admission of the diversion of Plaininvest's funds to an unauthorized purpose was not a declaration against pecuniary interest by a declarant unavailable to testify, see McCormick, Evidence §§ 276, 277, 280 (Cleary ed. 1972).

## V. *Receipt of testimony concerning Bahamian bank transactions*

■ The Government's case rested heavily on the testimony of Latvis, former manager of the FNCB Nassau branch who is no longer with the Bank, and his secretary, Miss Reilly, now employed at its branch in Tarrytown, N.Y. Appellants contend that because of the Bahamian Bank Secrecy Act, the court should not have permitted Latvis or Miss Reilly to testify about the various banking transactions at the FNCB Nassau branch. The Bahamian Bank Secrecy Act provides, under penal sanction, that

Except for the performance of his duties or the exercise of his functions under this Act or when lawfully required to do so by any court of competent jurisdiction within the Colony or

under the provisions of any law, no person shall disclose any information relating to the affairs of a bank or of the customers of a bank which he has acquired in the performance of his duties or the exercise of his functions under this Act.

The district court authorized the submission to a Bahamian court of an International Request for Judicial Assistance, contemplated by the Bahamian Act, for the disclosure of the records here relevant. Justice J. A. Smith granted the request on May 31, 1973, but his order was stayed pending an appeal but not later than June 30. Before that date the trial here was concluded.

We do not read our decisions dealing with the application of bank secrecy laws to American banks whose foreign branches are governed thereby, First National City Bank v. I.R.S., 271 F.2d 616 (2 Cir. 1959), cert. denied, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960); Application of Chase Manhattan Bank, 297 F.2d 611 (2 Cir. 1962); United States v. First National City Bank, 396 F.2d 897 (2 Cir. 1968), and Trade Development Bank v. Continental Ins. Co., 469 F.2d 35, 39–42 (2 Cir. 1972), to go as far as appellants urge. In Application of Chase Manhattan Bank, *supra*, the case most favorable to the appellants, we simply declined, on the facts there presented, to use the process of our courts to force an American bank doing business in a foreign country to take action in that country which would constitute a crime. It is not at all clear that under the principles normally applied in the interpretation of criminal statutes, the revelations by Mr. Latvis and Miss Reilly in New York would constitute a crime under Bahamian law. Even if it would, no principle of accommodation requires the United States to seal the lips of American citizens testifying to facts within their knowledge concerning activities of other Americans in a foreign country as part of a scheme to violate American criminal law, simply because that country chooses to throw a veil of

secrecy around bank accounts except insofar as their courts may see fit to lift it. We thus have no occasion to consider the Government's contention that the balance struck in the cited decisions requires reconsideration favorable to it because of enactment of The Bank Secrecy Act, 84 Stat. 1114.

### VI. *The use of an interpreter*

■ The question of Mrs. Dominguez' need for a Spanish interpreter had been discussed at a pretrial hearing. The Government represented that it would establish such a need at the trial. Counsel for one of the defendants objected on the ground that Mrs. Dominguez was fluent in English and that permitting her to have the services of an interpreter would give her an undue advantage in cross-examination. The judge refused to conduct an evidentiary hearing on Mrs. Dominguez' proficiency in English, saying that in all probability he would permit an interpreter to stand by and allow Mrs. Dominguez to use her when and if needed.

Over objection an interpreter was sworn at the beginning of the trial. After satisfying himself that Mrs. Dominguez spoke and understood English, the judge decided to take her testimony in that language but advised her to communicate with him if she needed a Spanish interpreter. The direct examination was conducted almost entirely in English. However, on cross-examination the witness on several occasions resorted to the interpreter without prior authorization from the court. Over repeated objection by defense counsel, the interpreter answered roughly a dozen questions for her during her day-long cross-examination.

We are not altogether happy about the manner in which this matter was handled. The reason initially given by the Government for having an interpreter, that Mrs. Dominguez speaks Spanish "nearly 70 per cent of the time," seems to backfire; if the Government meant that she spoke English 30 per cent of the time, this is quite a lot. Its argument that "as early as the fifth page of direct examination, it was clear that an interpreter would be periodically required" is rather disingenuous. The interpreter was there required only to help Mrs. Dominguez explain that a bank account opened by her mother on her attaining 21 was a "savings account." She went on for 40 pages without requiring further assistance. On the second occasion she relied on the interpreter simply to help her describe Frank and Miller's "assassination" explanation at the final meeting. She then concluded her direct examination without further need of the interpreter's aid. We assume defendants would have raised no objection to the use of an interpreter solely for technical terms or five syllable words. Certainly such limited use of an interpreter would have been perfectly proper. The defendants' point is different. They claim that if Mrs. Dominguez could do that well on direct examination, there was no need for the more extensive reliance on the interpreter that occurred on cross.

The argument is not quite so strong as it seems. Mrs. Dominguez had appeared before the grand jury and had doubtless gone over her testimony with the prosecutor. Her relative familiarity with the lines taken on direct examination almost certainly enhanced her ability to understand the questions and respond in English. The surprise of cross-examination is a different matter. Still, we are disturbed by her occasional resort to the interpreter when a cross-examiner seemed to approach at least a minor success. Here again, see note 16, the judge may have been the victim of his ground-rule forbidding counsel to state the basis for their objections without special permission; counsel might have suggested such courses as a slackening of speed, rephrasing of questions by the interrogator or the court, or enforcement of the judge's directive that Mrs. Dominguez request permission to use the interpreter on each occasion when the need arose. On the other hand, the jury observed what was going on and

defense counsel were free to comment on it in their summations, as one of them did. Counsel have cited no case where a conviction has been reversed because of the improper use of an interpreter, although, despite Perovich v. United States, 205 U.S. 86, 91, 27 S.Ct. 456, 51 L.Ed. 722 (1907), there have been some reversals for refusal to appoint one, obviously a stronger case. See 3 Wigmore, Evidence § 811, at 277–78 & n. 2 (Chadbourn rev. 1970); United States v. Desist, 384 F.2d 889, 901–903 (2 Cir. 1967), aff'd without discussion of this point, 394 U.S. 244, 89 S.Ct. 1030, 22 L. Ed.2d 248 (1969); United States ex rel. Negron v. New York, 434 F.2d 386, 389–390 (2 Cir. 1970); United States v. DiazBerrios, 441 F.2d 1125, 1127 (2 Cir. 1971). All things considered, we find no abuse of discretion by the judge sufficiently prejudicial to require a reversal.

VII. *The instructions and refusal to instruct concerning the effect of a conviction on Mrs. Dominguez' civil suit*

At the conclusion of his charge to the jury, Judge Pollack asked the parties to submit exceptions to the instructions he had given. After the defendants had raised several objections, he commented, "You know, I am a little disturbed over the fact that you are sitting here with these things that you had for some days." The Government, he pointed out, had submitted elaborate requests to charge, and a supplementary request relating to the relationship between a criminal conviction and a subsequent civil suit. He noted that the defendants had neither submitted requests to charge nor objected to any of the Government's requests prior to his delivering the charge. Not surprisingly, the judge's instruction on the effect of a conviction on Mrs. Dominguez' civil suit was heavily influenced by the Government's request.

The judge began by pointing out, quite correctly, that "The pendency of a private civil lawsuit referring to the transactions mentioned here is no de-fense to this indictment" and by explaining the different functions of criminal prosecutions and civil suits. He went on, however, to say:

Thus, a conviction in a criminal action does not support a subsequent civil judgment in a case of this sort based on the same transactions because each of such proceedings has a totally different object. In addition, they are dissimiliar in terms of parties, rules and procedures.

Where defendants in a criminal prosecution of this kind are sued in a civil trial based on the same transactions, the two proceedings are completely unrelated, except only in respect of whether the civil matter may bear on the issue of credibility. That is to say, if the defendants are convicted in the criminal action, the plaintiffs in the civil suit will still have to prove their entire case for damages before a new jury or judge and could in no way rely on defendant's prior conviction to sustain their claim.

He later gave a fairly detailed "interest" charge with respect to credibility, instructing the jury as follows:

In weighing the testimony of the witness, you can consider their relationship to the Government or to the defendant, as the case may be, and any bias or interest in the outcome of the case. . . .

Interest creates a motive for false testimony. The greater the interest, the stronger the motive for false testimony. In appraising credibility you may take that fact into consideration. However, it by no means follows that simply because a person has a vital interest in the end result, he or she is not capable of telling a truthful, candid and straightforward story.

It is for you to decide to what extent, if at all, any interest of the witness has affected or shaded the testimony.

When the time came for making objections, trial counsel for Hoffer ex-

cepted "to what was the Government's supplementary charge with respect to the civil lawsuit and the language used by the Court." While this alone would have been too general, counsel for Frank amplified it, saying that

> I think that the outcome of the criminal case is definitely a matter that can be related to the civil case in the sense that if there is a conviction, the jury's verdict could be deemed to be res judicata in the civil suit even though you have different parties on the same subject matter and where the evidence would be identical.

After counsel elaborated further on this point, the judge noted that he had given "a very strong interest charge." Counsel conceded this and on that account withdrew "any exception to the statement that the civil suit will be no defense—", at which point the judge interrupted. It may be that if he had not, counsel would also have withdrawn the objection to the remarks that "a conviction in a criminal action does not support a subsequent civil judgment in a case of this sort based on the same transactions," that "the two proceedings are completely unrelated, except only in respect of whether the civil matter may bear on the issue of credibility," and that Mrs. Dominguez "could in no way rely on defendants' prior conviction" in her civil suit; but we cannot find that any such withdrawal occurred. The issue is academic in any event since counsel for Hemlock then requested that the judge charge, "in connection with the civil suit . . . that the jury may consider the question of motive or inter-

est of such witness or party because she stands to gain something in the event of a conviction in this case." In response to this, the judge gave an additional instruction [17] which does not seem to have added or subtracted anything.

Defendants' claim is that, in a diversity action in the Southern District of New York, the court would be bound to follow New York law on the collateral estoppel effect of a criminal conviction in a subsequent civil suit by a private person. The highest court of New York, they note, has recently held that under modern principles a criminal conviction is conclusive in any subsequent civil action as to any issues necessarily determined against the defendants in the criminal case, S. T. Grand, Inc. v. City of New York, 32 N.Y.2d 300, 344 N.Y.S.2d 938, 298 N.E.2d 105 (1973) (federal judgment convicting plaintiff corporation and its president of bribing City Water Commissioner precludes relitigation of validity of ensuing contract), and that the quoted instructions were thus in error.

The Government challenges defendant's legal position.[18] Relying on Kern v. Hettinger, 303 F.2d 333, 340 (2 Cir. 1962), it argues that the question of the effect of convictions in this case in a civil suit in a federal district court is one of federal law and, implicitly, that it should be decided in the negative.

We do not accept either branch of the Government's argument. Kern v. Hettinger, *supra,* held only that whether a dismissal in a diversity action by a federal district court ' in California was to be read as being with or without preju-

---

17. "Now, I believe I have sufficiently charged you on the issues of interest and motives and the things that you have to keep your eye on and what you are really here to decide, and in an excess of caution I will say to you that there is no doubt that Mrs. Dominguez has a civil suit pending. I think I have sufficiently indicated to you what the relationship is between that suit and this, other than the fact that naturally she is a litigant and has an interest in that civil suit, and you may consider her testimony accordingly."

18. The Government has not sought to distinguish *Grand* on the basis that there collateral estoppel was being used by New York City defensively whereas Mrs. Dominguez would be using it offensively. In view of the New York court's earlier decision in B. R. De Witt, Inc. v. Hall, 19 N.Y.2d 141, 278 N.Y.S.2d 596, 225 N.E.2d 195 (1967), the failure to raise this point seems to have been well-advised.

dice must be determined in accordance with F.R.Civ.P. 41 rather than by the California state rule. Citing Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed. 2d 953 (1958), the court ruled that in a clash between state law principles and the Federal Rules of Civil Procedure, the Federal Rules would prevail. See Hanna v. Plummer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). The *Kern* case would be relevant if, but only if, some competent federal authority had decreed that a federal criminal conviction should not have collateral estoppel effect in private civil litigation. Since we know of no such decree, we see no reason why the district court seized of Mrs. Dominguez' diversity action should not endeavor to reach the same result as would a New York court sitting "a block away". Guaranty Trust Co. v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). See Berner v. British Commonwealth Pacific Airlines, Ltd., 346 F.2d 532, 539–540 (2 Cir. 1965) cert. denied, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966); Breeland v. Security Insurance Co. of New Haven, 421 F.2d 918, 921 (5 Cir. 1969).

■ Even if the question of the effect of a conviction on relitigation of the fraud in Mrs. Dominguez' civil suit were to be determined by federal law, our abandonment of the mutuality requirement in Zdanok v. Glidden Co., 327 F.2d 944 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); see also United States v. Webber, 396 F.2d 381 (3 Cir. 1968); James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451 (5 Cir.) cert. denied, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); Bernhard v. Bank of America National Trust & Savings Ass'n, 19 Cal.2d 807, 122 P.2d 892 (1942), now approved by the Supreme Court so far as concerns defensive use of collateral estoppel, Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), would lead us to hold that a conviction here will operate as collateral es-

toppel in favor of Mrs. Dominguez in her civil suit, although neither *Zdanok* nor *Blonder-Tongue* involved the criminal-civil interplay. It is true, as the Government suggested at argument, that such a holding may subject complaining witnesses in federal criminal trials to more severe attacks on credibility than would otherwise be the case. Arguably, and perhaps more seriously, it provides too tempting a reward for overstatement or even perjury. While such fears are not utterly without basis, we think they are overcome by the desirability of a rule that a fact once established, after full and fair trial, beyond a reasonable doubt, should not have to be relitigated in a context where a preponderance of the evidence is all that is required. As the Fifth Circuit noted in Breeland v. Security Insurance Co. of New Haven, *supra*, 421 F.2d at 922, citing many cases, in attempting to predict a decision by the Supreme Court of Louisiana, "The number of jurisdictions holding that a criminal conviction precludes litigation of the same issue in a civil suit is ever increasing." We see no reason why federal courts should not follow the general trend—a trend which they have played a not inconsiderable part in bringing about.

■ It does not follow, however, that a judge must deliver a lecture on the law of issue preclusion in charging a jury with respect to the credibility of a complaining witness who has instituted a civil suit. A full statement of the conditions on the application of collateral estoppel and the limitations on its scope would be more likely to confuse than to enlighten. It would suffice to say that a conviction could operate to the advantage of the plaintiff in the civil suit, or, as counsel for Hemlock requested, that the witness "stands to gain something in the event of the conviction in this case." In determining whether the charge as given not only was error but requires reversal, instructions like these afford the appropriate benchmark.

■ While the distance between the benchmark and the instructions that

were given was still substantial, we do not think this single slip requires reversal under the principles with respect to errors not of constitutional dimensions laid down in Kotteakos v. United States, 328 U.S. 750, 761–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[19] The judge did not misinform the jury as to the elements of the crimes or as to anything relating to the defendants themselves. His error related only to the degree of discount to be applied in evaluating the testimony of an adverse witness, albeit an important one, with respect to whom he had already given a full "interest" instruction. The jury had surely gotten the idea that Mrs. Dominguez was no longer a friend of the defendants and that she wished them ill. The degree of difference a charge like that sought by Hemlock's attorney would have created in weighing Mrs. Dominguez' credibility, let alone in determining the defendants' guilt, is too small to warrant a reversal. Our conviction "is sure that the error did not influence the jury, or had but very slight effect." 328 U.S. at 764, 66 S.Ct. at 1248.

Although content to rest decision on that basis, we add a word from which counsel could profit in the future. The course that defense counsel pursued in raising this objection to the court's charge seriously weakens their claim of prejudicial error. While counsel can "protect the record" for appellate review simply by objecting to instructions at the conclusion of the judge's charge, that is a poor way to proceed in a matter such as that here under discussion. The judge might reasonably be reluctant to submit a supplemental instruction or correct what he perceives to be minor inaccuracies in his earlier charge for fear that doing so would draw undue attention to the new instruction, or that the jury might be confused in attempting to determine what was withdrawn and what was left of the original charge. This case provides a good illustration of the dilemma in which the deferral of defense objections on a point raised by the Government's requests to charge can place a trial judge. With the jury ready to retire, he was suddenly forced to make a quick determination on a difficult point of law without the aid of any authority except that cited in the Government's request. Even if he had felt that there was merit in the defendants' point, he would still have to decide on the spot how much of their suggested charge to adopt and how to deliver the supplemental charge in a manner that would convey its proper weight to the jury. Here, for example, a strong supplemental charge indicating that Mrs. Dominguez had a great deal to gain from the conviction of the defendants might well have suggested to the jury that the judge had had second thoughts about Mrs. Dominguez' credibility and now deemed her testimony likely to have been seriously distorted. If we thought the error more serious than we do, we would have to consider whether defendants should be allowed to secure a retrial bcause of an error which, though they did not invite, they had failed to take effective measures to prevent.

We have considered the few other points raised by defendants but do not believe them to have sufficient merit to warrant discussion.

The convictions are affirmed.

---

19. Although the "harmless error" statute construed in *Kotteakos*, § 269 of the Judicial Code, see 328 U.S. at 757, 66 S.Ct. 1239, has been replaced by 28 U.S.C. § 2111, the views expressed in *Kotteakos* remain authoritative. See United States v. Kahaner, 317 F.2d 459, 485 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963); United States v. Birnbaum, 373 F.2d 250 (2 Cir.), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967); 3 Wright, Federal Practice and Procedure (Criminal) § 853–54 (1969).