Christopher D. JOHNSON and John M. Dinan, in their capacity as Official Liquidators of an unnamed offshore financial institution, Petitioners,

v.

UNITED STATES of America, Respondent.

Civil Action No. 96–5043(AJL).

United States District Court, D.   New Jersey.

May 7, 1997.

Mark J. MacDougall, Shari L. Fleishman, Matthew A. Rossi, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, D.C., for Petitioners.

Faith S. Hochberg, United States Attorney, John J. Carney, Donna D. Gallucio, Asst. U.S. Attys., Newark, New Jersey, for Respondent.

## OPINION

LECHNER, District Judge.

This matter was commenced by the filing of a petition (the "Petition") for return of property, pursuant to Federal Rule of Criminal Procedure 41(e). The petitioners, Christopher D. Johnson and John M. Dinan (collectively the "Petitioners") are "Joint Official Liquidators of an Unnamed Financial Institution, formerly a bank and trust company organized under the laws of the Cayman Islands, with offices in George Town, Grand Cayman" (the "Offshore Bank"). Petition at 1–2. Petitioners seek the "return of one or more computer tapes" (the "Tape") containing operating records of the Offshore Bank.[1]

*Facts*

On 18 January 1995, the government of the Cayman Islands, upon the recommendation of the "Inspector of Financial Services," appointed an interim controller (the "Interim Controller") to take control the affairs of the Offshore Bank. Joint Stip., ¶ 2; Johnson Aff., ¶ 4. At that time, the Offshore Bank had approximately "1,000 clients/customers, including corporations, trusts and individuals of which some but not all were residents of the United States." Johnson Aff., ¶ 14. Prior to the Interim Controller's assumption of control of the Offshore Bank, an unnamed

1. Petitioners have submitted: Memorandum of Points and Authorities in Support of Petition for Return of Property Pursuant to Federal Rule of Criminal Procedure 41(e) (the "Moving Brief"), Affidavit of Christopher D. Johnson (the "Johnson Aff."), Affidavit of Angus John Elliot Foster (the "Foster Aff."), Affidavit of Penny A. Hill (the "Hill Aff."), Petitioners' Reply Brief (the "Reply Brief") and Petitioners' Statement Regarding the Effect of the Recent Developments in the Criminal Case on the Petition for Return of Property.

The Government has submitted: Brief of the United States in Opposition to the Petitioners' Motion for Return of Property (the "Opposition Brief"), Affidavit of Sean W. McCarthy (the "McCarthy Aff."), Declaration of James P. Springer (the "Springer Decl.") and Letter of John J. Carney.

In addition, the parties have submitted a Joint Stipulation (the "Joint Stip.") setting forth facts not in dispute.

United States citizen (the "Individual Defendant") had occupied the positions of chairman and managing director of the bank. Joint Stip., ¶ 2. The authority of the Individual Defendant over the affairs of the Offshore Bank ceased upon the appointment of the Interim Controller. *Id.,* ¶ 3; *see* Johnson Aff., ¶ 9. After appointment of the Interim Controller, the Individual Defendant had "no entitlement to possession or right of access of the property, books or records (including computerised (sic)) of the [Offshore] Bank or copies thereof." Johnson Aff., ¶ 9.

On 24 January 1994, the Offshore Bank's "category 'B' Bank & Trust company licences" were revoked by the government of the Cayman Islands and the bank was closed by the Interim Controller. Joint Stip., ¶ 2; Johnson Aff., ¶ 4. On the same date, the government of the Cayman Islands filed a petition (the "Cayman Petition") with the Grand Court of the Cayman Islands for an order to wind-up the affairs of the Offshore Bank because of "serious irregularities" identified in the conduct of the Offshore Bank's business. Johnson Aff., ¶ 4. Also on the same date, by order of the Grand Court of the Cayman Islands, Messrs. G.J. Cleaver and Allan Gee were appointed as Joint Provisional Liquidators (the "Joint Provisional Liquidators"), pending the hearing of the Cayman Petition. Johnson Aff., ¶ 4.

On 10 February 1995, the Cayman Petition was heard by the Grand Court of the Cayman Islands. Johnson Aff., ¶ 7. The Grand Court of the Cayman Islands ordered that the Offshore Bank be "wound up (liquidated)...." *Id.*

Petitioners are partners in the firm Coopers & Lybrand. Joint Stip., ¶ 1. Petitioners were appointed to their positions as "Joint Official Liquidators" of the Offshore Bank by order of the Grand Court of the Cayman Islands, effective 10 February 199. *Id.* Petitioners have the power

a. to take possession of, collect and get in all property or assets of whatever nature to which the [Offshore Bank] is or appears to be entitled;

b. to do all such things as may be necessary or expedient for the protection of the [Offshore Bank's] assets;

c. to do all such things as may be necessary or expedient for the beneficial realisation (sic) of the property or assets of the [Offshore Bank]....

Johnson Aff., ¶ 8 & Exh. B, ¶ 5.

By the terms of the order appointing Petitioners as "Official Liquidators" of the Offshore Bank, "the Individual Defendant was not permitted 'to enter the premises of the [Offshore Bank];' 'to have access, whether directly or by way of copy or otherwise, to any books, records or other documents (including computerized records) of the [Offshore Bank];' or 'to deal with any of the assets or other property of the [Offshore Bank], ... without the prior consent of the Inspector of Financial Services or an order of the Grand Court of the Cayman Islands....'" Joint Stip., ¶ 3; Johnson Aff., Exh. B, ¶ 7.

"In or about the month of March or April, 1995, the Individual Defendant left the Cayman Islands...." Joint Stip., ¶ 4. After leaving, the Individual Defendant apparently did not reenter the Cayman Islands at any time. *See* Johnson Aff., ¶ 9.

On 21 June 1996, a Federal Grand Jury sitting in Newark, New Jersey returned a multi-count indictment charging the Individual Defendant and others with conspiracy and money laundering. Joint Stip., ¶ 5. The Individual Defendant was subsequently arrested in the United States by agents of the Federal Bureau of Investigation (the "FBI"). *Id.*

In June of 1996, the Individual Defendant gave the FBI the Tape. Joint Stip., ¶ 6. The Tape contains "copies of certain computer back-up tapes containing detailed financial and operating records of the [Offshore] Bank." Joint Stip., ¶ 6. The Individual Defendant voluntarily gave the Tape to the FBI "without the issuance of a warrant, subpoena or other compulsory process." *Id.* The Tape remains in the possession of the FBI or other "elements of the Department of Justice." *Id.*

"All of the [Offshore] Bank's operating records, including work files, daily transactions posted in such files, the [Offshore] Bank's

permanent accounting and client records, historical transaction files and securities records were maintained on a specialized computer system, known as the 'BOS Bank 2000.'" Joint Stip., ¶ 7; Johnson Aff., ¶ 14. The Tape contains "a *duplicate* of substantially all of the [Offshore] Bank's records maintained on the BOS Bank 2000 System...." *Id.* (emphasis added). The Tape holds four sections of the Offshore Bank's computer records, "technically known as D3, D5, E1 and E2," summarized as follows:

D3    The [Offshore] Bank's work files containing transactions posted in these files on a daily basis before being posted onto the appropriate accounts (D5 below) at the end of each banking day.

D5    Code tables and master files containing the entire body of the Bank's permanent accounting records and client records.

E1    Historical transaction files which list chronologically each transaction on each account.

E2    Securities records (the respective holding of each client).

Joint Stip., ¶ 7; Hill Aff., ¶ 4.

On or about 16 February 1997, the Offshore Bank's records had been copied onto the Tape and the Tape was subsequently delivered to the Individual Defendant by "an unknown individual or individuals, approximately one month after the appointment of the [I]nterim [C]ontroller on [18 January 1995] and after the [Offshore] Bank had been closed by order of the Grand [Cayman] Court on [24 January 1995] and the Individual Defendant's authority was discontinued." Joint Stip., ¶ 9.

Because the Tape was encrypted, the FBI communicated with the Royal Cayman Islands Police (the "Cayman Police") and sought assistance in its efforts to gain access

to the information stored on the Tape. Joint Stip., ¶ 8. On or about 31 July 1996, Petitioners were informed by the Cayman Police the FBI possessed the Tape and were attempting to gain access to the information contained on the Tape. *Id.; see* Hill Aff., ¶¶ 3–7.

On 6 August 1996, Johnson filed a formal, written complaint of the "theft" of the Tape to the Cayman Police. *See* Johnson Aff., Exh. D. Johnson informed the Cayman Police that Petitioners believed the Individual Defendant "may have instructed a former member of his staff ... to secretly obtain [the Tape] for him." *Id.* The notice to the Cayman Police further provided:

I would emphasise (sic) my *particular concern* about the consequences of this breach in security because, as you know, the information apparently stolen is now in the hands of the FBI and, it would seem inevitable that *this will sooner or later be passed to the Internal Revenue Service* for the purpose of investigating and, where appropriate, *prosecuting* any bank clients subject to U.S. taxation. I believe these events will be potentially very damaging to the wider public profile of this jurisdiction and the reputation of the banking industry.

Johnson Aff., Exh. D (emphasis added).[2]

In response to an application from Petitioners, the Grand Court of the Cayman Islands authorized Petitioners, by an order, filed 5 September 1996, to seek recovery of the Tape through legal process in courts of the United States. *See* Johnson Aff., ¶ 21 & Exh. E. On 25 October 1996, Petitioners commenced the instant action.

*Discussion*

### I.   *Federal Rule of Criminal Procedure 41(e)*

█    Federal Rule of Criminal Procedure 41(e) ("Rule 41(e)") provides in pertinent part:

Federal authorities are potentially very damaging to those of the [Offshore] Bank's clients *liable for taxation* in the U.S. In the likely event that the Federal authorities share the information ... with the Internal Revenue Service, we would anticipate widespread investigation and possibly *prosecution* of the [Offshore] Bank's clients." *See* 8 August 1996 Letter at 2 (emphasis added).

---

**2.**   On 8 August 1996, upon discovering the apparent theft of the Tape, Cayman Island counsel for Petitioners sent a letter (the "8 August 1996 Letter") to the British counsel for the Individual Defendant complaining of the theft of the Tape. Significantly, Cayman Islands counsel for Petitioners wrote "it is quite obvious that the consequences of the seizure of these records by the

A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court ... for the return of the property on the ground that such person is entitled to lawful possession of the property. The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings.

*Id.*

Rule 41(e) is understood to provide "that an aggrieved person may seek return of property that has been unlawfully seized, and a person whose property has been lawfully seized may seek return of property when aggrieved by the [G]overnment's continued possession of it." *See id.*, Advisory Committee's Note. Rule 41(e) provides a framework under which a court may order either the originals or copies of seized documents be returned to their owner and permit the Government access and/or use of the information. *See id.*

While Rule 41(e) motions are generally brought after an indictment has been issued, "district courts have the power to entertain motions to return property seized by the [G]overnment when there are no criminal proceedings pending against the movant." *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir.1993), *cert. denied*, 511 U.S. 1058, 114 S.Ct. 1624, 128 L.Ed.2d 349 (1994). These motions "are treated as civil equitable proceedings and, therefore, a district court must exercise 'caution and restraint' before assuming jurisdiction." *Id.* (citing *Kitty's East v. United States*, 905 F.2d 1367, 1370 (10th Cir.1990)); *see United States v. Dean*, 80 F.3d 1535, 1542 (decision to invoke equitable jurisdiction is only appropriate in exceptional cases), *modified on other grounds*, 87 F.3d 1212 (11th Cir.1996).

The Fifth Circuit has listed four factors that a district court should consider in deciding whether to entertain a Rule 41(e) motion made prior to the initiation of criminal proceedings. These factors include:

(1) whether the Government displayed a callous disregard for the constitutional rights of the movant,

(2) whether the movant has an individual interest in and need for the property he [or she] wants returned,

(3) whether the movant would be irreparably injured by denying return of the property, and

(4) whether the movant has an adequate remedy at law for the redress of his [or her] grievance.

*Richey v. Smith*, 515 F.2d 1239, 1243 (1975); *see Ramsden*, 2 F.3d at 324–25 (adopting the Fifth Circuit's Analysis); *see also Kitty's East*, 905 F.2d at 1370–71 (movant must establish irreparable injury and lack of adequate remedy at law); *In re Sixty Seven Thousand Four Hundred Seventy Dollars*, 901 F.2d 1540, 1544–45 (11th Cir.1990) (the exercise of equity jurisdiction only appropriate where the circumstances demand intervention); *Matter of Search of 4801 Fyler Avenue*, 879 F.2d 385, 387 (8th Cir.1989) (aggrieved party must establish callous disregard for constitutional rights, irreparable injury if relief is not granted and lack of an adequate remedy at law), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990); *In re Singh*, 892 F.Supp. 1, 3 (D.D.C. 1995).

### 1. Constitutional Rights

In the instant case, the Government has not shown a "callous disregard" to any constitutional rights of Petitioners or any clients of the Offshore Bank. First, the Government played no role in the procurement of the Tape. As indicated, the Tape was voluntarily provided to the Government by the Individual Defendant. *See* McCarthy Aff., ¶ 7. Second, because there was no Government involvement in the procurement of the Tape, no constitutional rights are at issue in the instant case. Accordingly although it appears the Individual Defendant may have illegally come into possession of the Tape, the Fourth Amendment does not prevent its use by the Government. *See Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

In *Burdeau*, the Court held:

The Fourth Amendment gives protection against unlawful searches and seizures, and ... its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

*Burdeau,* 256 U.S. at 475, 41 S.Ct. at 576. The rights afforded by the Fourth Amendment are "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *United States v. Jacobsen,* 466 U.S. 109, 113–14, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (quoting *Walter v. United States,* 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)); *see also United States v. Kinney,* 953 F.2d 863, 865 (4th Cir.) ("The Fourth Amendment is directed exclusively at state action and evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.") (citing *Burdeau,* 256 U.S. at 475, 41 S.Ct. at 576, *cert. denied,* 504 U.S. 989, 112 S.Ct. 2976, 119 L.Ed.2d 595 (1992); *United States v. Mehra,* 824 F.2d 297, 299 (4th Cir.), *cert. denied,* 484 U.S. 915, 108 S.Ct. 263, 98 L.Ed.2d 220 (1987)); *Meister v. Commissioner of Internal Revenue,* 504 F.2d 505, 508–09 (3d Cir.1974) (protection of the Fourth Amendment applies to governmental actions), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975).

■ The burden of proving that a private search is governmental action lies on the movant, in this case Petitioners. *See United States v. Feffer,* 831 F.2d 734, 739 (7th Cir. 1987) ("It is the movant's burden to establish by a preponderance of the evidence that the private party acted as a government instrument or agent."); *United States v. Reed,* 15 F.3d 928, 931 (9th Cir.1994) ("The defendant has the burden of showing government action.") (citing *United States v. Gumerlock,*

590 F.2d 794 (9th Cir.) (en banc), *cert. denied,* 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979)).

There is no dispute that the Individual Defendant acted on his own when he procured the Tape. Petitioners do not argue, and there does not appear to be any evidence supporting an inference, the Individual Defendant acted on behalf of the Government when he took possession of the tape. The parties have stipulated the Individual Defendant "voluntarily gave the Tape to special agents of the FBI, without issue of a warrant, subpoena or other compulsory process." Joint Stip., ¶ 6. Accordingly, the Government's use of the Tape in its investigation of the suspected tax evasion scheme and other suspected financial crimes connected to the Offshore Bank and in future prosecutions will not violate the constitutional rights of the Offshore Bank or any of its clients.

### 2. *Petitioners' Need for the Tape*

Petitioners have not demonstrated a need for the return of the Tape. As indicated, the Tape is a copy of information contained on the Offshore Bank's computer system. *See* Johnson Aff., ¶ 15. Petitioners are in possession of the information contained on the Tape and, accordingly, return of the Tape does not appear necessary for Petitioners to carry on the Offshore Bank's business.

Petitioners, however, argue that "[g]iven the extent of the information contained on the ... Tape, [they] will be unable to proceed in the timely performance of their duties ... unless and until the ... Tape is returned...." Moving Brief at 15 (citing Johnson Aff., ¶ 18). Petitioners state:

In the event that the information contained on the ... Tape is made public or communicated ... to any third party, including ... the Internal Revenue Service, numerous clients/customers of the [Offshore] Bank ... may be subject to investigation, audit and/or administrative or civil litigation. This in turn is likely to give rise to numerous complaints and claims against the [Offshore] Bank by such clients/customers as a result of such unauthorized disclosure of confidential information with

the consequent potential financial loss to the [Offshore] Bank to the prejudice of its genuine creditors.

Johnson Aff., ¶ 18. Petitioners, however, do not explain the manner in which possible future claims prevent them from performing their duties. The fact the Offshore Bank is in liquidation and apparently is or will shortly be defunct undercuts the argument advanced by Petitioners regarding their need of the Tape to carry out their duties.

The speculative argument that the use of the Tape by the Government may expose the Offshore Bank to "numerous complaints and claims" is not persuasive. Petitioners have failed to point to any instance where a Cayman Island bank was held liable to one of its clients because of disclosure of information to United States law enforcement officials. As will be discussed, the Tape is being used by the Government to investigate a "widespread tax evasion scheme." *See* McCarthy Aff., ¶ 10. The Government further argues its investigation is "ongoing" and that the Tape "may also document the concealment of assets for the purpose of perpetrating financial frauds in the [United States]." Opposition Brief at 6 & n. 4.

Petitioners do not explain the manner in which exposure to criminal investigation and prosecution in the United States will expose the Offshore Bank to claims from its clients. The fact that United States citizens are "required to reveal the existence of foreign bank accounts and report certain foreign transactions" under United States law further undermines the argument of Petitioners. *See United States v. Davis*, 767 F.2d 1025, 1035 (2nd Cir.1985) (citing 31 U.S.C. § 5314; 31 C.F.R. § 103.24; *see United States v. Payner*, 447 U.S. 727, 732 & n. 4, 100 S.Ct. 2439, 2444 & n. 4, 65 L.Ed.2d 468 (1980) ("American depositors know that their own country requires them to report relationships with foreign financial institutions.... [R]espondent[, therefore,] lacked a reasonable expectation of privacy in the ... records that documented his account"). Petitioners have not provided any support for their argument

the Offshore Bank may be exposed to liability under these circumstances.

### 3. *Irreparable Harm*

The speculative nature of the argument regarding possible future claims undermines the position of Petitioners that the Offshore Bank will suffer "irreparable harm" if the Tape is not returned. As indicated, the licenses of the Offshore Bank have been revoked and the bank is in liquidation. Johnson Aff., ¶ 20. The argument that the use of the Tape will cause injury to the offshore banking industry as a whole is similarly speculative and unavailing.

### 4. *Petitioners' Remedy at Law*

The argument that Petitioners have no adequate remedy at law, is also questionable. Should the Offshore Bank be indicted, it will be able to seek the suppression of the Tape during the criminal case.[3] *See* Fed. R.Crim.P. 41(f).

Even assuming Petitioners have no adequate remedy at law, exercise of the equitable jurisdiction under Rule 41(e) is not appropriate. As indicated, Petitioners have not shown the Offshore Bank will suffer irreparable injury, this makes the argued lack of adequate remedy at law appear immaterial. Accordingly, the facts of the instant case do not justify the exercise of the court's equitable jurisdiction pursuant to Rule 41(e) to order the "extreme" remedy of forbidding the Government the use of the Tape in its investigation. *See, e.g., Grimes v. Commissioner of Internal Revenue*, 82 F.3d 286, 291 (9th Cir.1996).

### II. *The Merits*

■■■ Even if Petitioners were able to establish they would suffer irreparable harm, the exercise of equitable jurisdiction to forbid the Government the use of the Tape is not justified. Rule 41(e) provides for the remedy of suppression where the originals of the seized material and copies are returned or

---

**3.** Petitioners, moreover, may have rights against the Individual Defendant for the Offshore Bank's

losses incident to his theft of the Tape.

destroyed, only in *"extreme circumstances."* *Grimes,* 82 F.3d at 291 (emphasis added).

■ "The spirit of Rule 41(e) is one of compromise." *Ramsden,* 2 F.3d at 327. The Advisory Committee Note to the 1989 amendment of Rule 41(e) provides:

> As amended, Rule 41(e) avoids an all or nothing approach whereby the [G]overnment must either return records and make no copies or keep originals notwithstanding the hardship to their owner. The amended rule recognizes that reasonable accommodations might protect both the law enforcement interests of the United States and the property rights of property owners and holders. In many instances documents and records that are relevant to ongoing or contemplated investigations and prosecutions may be returned to their owner as long as the [G]overnment preserves a copy for future use.... The amended rule contemplates judicial action that will respect both possessory and law enforcement interests.

*Id.* Accordingly, Rule 41(e) provides a balance whereby the property interests of the aggrieved party are protected and the legitimate law enforcement interests are not impaired. *Id.; see J.B. Manning Corp. v. United States,* 86 F.3d 926, 928 (9th Cir. 1996); *Grimes,* 82 F.3d at 290–91; *Ramsden,* 2 F.3d at 327; *Kitty's East,* 905 F.2d at 1372.

■ Generally, even where the Government improperly comes into possession of evidence and where the aggrieved party's Rule 41(e) motion is successful, courts have allowed the Government to retain copies of the evidence. *See Ramsden,* 2 F.3d at 327 (allowing the Government to retain copies of the documents at issue in the case despite the Government's violation of the petitioners' constitutional rights).

In *Grimes,* the Ninth Circuit addressed the issue of "whether the illegal seizure of evidence by agents of the Federal Bureau of Investigation and Drug Enforcement Agency ... necessarily precludes use of that evidence by the Internal Revenue Service ... in a civil tax proceeding." 82 F.3d at 287. The court held, despite the alleged illegal search:

Rule 41(e) does not offer ... any protection beyond that provided by the exclusionary rule. "Rule 41(e) does not constitute a statutory expansion of the exclusionary rule." *United States v. Calandra,* 414 U.S. [338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) ]. Construing the order for the return of property as a suppression order does not aid the [aggrieved party] beyond the reach of the exclusionary rule....

*Grimes,* 82 F.3d at 290. Under Rule 41(e) " 'suppression and return of property are separate and distinct inquiries.' " *J.B. Manning Corp.,* 86 F.3d at 927 (quoting *Kitty's East,* 905 F.2d at 1372).

As indicated, the primary concern of Petitioners appears to be that the information on the Tape may expose clients of the Offshore Bank, "liable for taxation" in the United States, to investigation and prosecution. *See* 8 August 1996 Letter at 2. Because Petitioners currently have access to the information contained on the Tape, the issue to be decided is whether the Government should be denied the use of the Tape.

*Comity*

As indicated, the use of the Tape by the Government does not violate the constitutional rights of the Offshore Bank or any of its clients. Petitioners, however, argue the doctrine of international comity requires the suppression of the Tape. Moving Brief at 20.

"Comity refers to the spirt of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nat. Ind. Aero. v. U.S. Dist. Court for the So. Dist. of Iowa,* 482 U.S. 522, 543 n. 27, 107 S.Ct. 2542, 2555 n. 27, 96 L.Ed.2d 461 (1987).

Comity

> is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to the international duty and convenience, and to the rights of its own citizens who are under the protection of its law.

*Republic of Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 75 (3d Cir.1994) (quoting *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 143–44, 40 L.Ed. 95 (1895)).

The comity doctrine " 'is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws.' " *Westinghouse,* 43 F.3d at 75 (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972)); *see Societe Nat.,* 482 U.S. at 543 n. 27, 107 S.Ct. at 2555 n. 27.

■ Comity, however, "must yield to domestic policy: 'no nation will suffer the laws of another to interfere with her own to the injury of her citizens.' " *Westinghouse,* 43 F.3d at 75 (quoting *Hilton,* 159 U.S. at 164, 16 S.Ct. at 143–44). The " 'obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act.' " *Id.* (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984)).

The doctrine of comity requires careful consideration of the foreign interests at stake. The Circuit has held that

> while it is true that principles of comity cannot compel a domestic court to uphold foreign interests at the expense of the public policies of the forum state, it can—and does—force courts in the United States to tailor their remedies carefully to avoid undue interference with the domestic activities of other sovereign nations.

*Westinghouse,* 43 F.3d at 75.

In the instant case, the Government states the information contained on the Tape constitutes "significant evidence" of a "widespread tax evasion scheme." *See* McCarthy Aff., ¶ 10. The Government has "initiated multiple investigations concerning suspected *criminal activities* by customers of the [Offshore] Bank." *Id.,* ¶ 11 (emphasis added).[4]

As indicated, Petitioners argue disclosure of the information contained on the Tape to Government agencies, such as the Internal Revenue Service, may expose the Offshore Bank to "numerous complaints and claims."

Johnson Aff., ¶ 18. Petitioners argue there is a "strong likelihood of financial loss to the [Offshore] Bank from the almost certain claims that would follow from the [Offshore] Bank's clients/customers." Reply Brief at 2. As indicated, this disclosure, according to Petitioners, will make their duties as Official Liquidators of the Offshore Bank impossible. *See* Moving Brief at 15.

Petitioners argue:

> Comity and deference to the laws of other nations should play a central role in the disposition of this case. The [Petitioners] have offered their cooperation to the United States in gaining access to the information contained on the Tape that is relevant to the [G]overnment's prosecution of the Individual Defendant and his co-defendants. *Further the U.S. government has recourse under the [Cayman Mutual Legal Assistance (USA) Law 1986 of the Cayman Islands to the Mutual Legal Assistance Treaty between the United Kingdom and the United States for the Cayman Islands] to obtain information in the Cayman Islands that may be relevant to criminal investigations or prosecutions, generally.* Accordingly, there is no countervailing United States interest overriding the interests of the [Petitioners], and indeed of the Cayman Islands, in seeing that the confidentiality of records protected by the Confidential Relationships ... Law and related Cayman statutes is maintained. Any interest the United States may have in searching the records maintained on the Tape for clues of unrelated, that is to say, in "fishing," is not legitimate.
>
> Thus, since the U.S. [G]overnment's "legitimate interests can be satisfied ... if the property is returned, continued retention of the property would be unreasonable."

Moving Brief at 22 (emphasis added)

### 1. Confidential Relationships (Preservation) Law of the Cayman Islands

The Cayman Islands is the fifth largest financial center in the world, with approxi-

---

4. The Government has submitted a video tape (the "Video Tape") of the television news journal "Frontline." The Video Tape contains hidden camera footage of the Individual Defendant ex- plaining the manner in which the Offshore Bank could aid a prospective client in the concealment of financial transactions. *See* Opposition Brief, Exh. B.

mately 570 established banks and trust companies. Johnson Aff., ¶ 20. "Overall bank deposits [in the Cayman Islands] are in excess of US$425 billion." *Id.* A main reason for the success of the Cayman Islands as a financial center is the high degree of privacy afforded to individuals, corporations and other entities doing business there. *See* Foster Aff., ¶ 5.

As indicated, Petitioners argue the information contained on the Tapes "would permit identification of many and possibly all of the clients/customers of the [Offshore] Bank...." Johnson Aff., ¶ 17. Petitioners argue that this disclosure would violate the Confidential Relationships (Preservation) Law of the Cayman Islands. *Id.; see* Cayman Confidential Relationships Law (Law 16 of 1976), as amended (Law 26 of 1979) (the "Cayman Confidential Relationships Law").

Except in certain circumstances, the Cayman Confidential Relationships Law renders the disclosure of confidential information concerning the affairs of a Cayman Islands bank's customers without their consent a crime. Foster Aff., ¶ 3; Cayman Confidential Relationships Law, Sections 3 & 5. Confidential information is defined under the Cayman Confidential Relationship Law to include "information concerning any property which the recipient thereof is not, otherwise than in the normal course of business, authorised (sic) by the principal to divulge." Cayman Confidential Relationships Law, Section 2.

The Cayman Confidential Relationships Law applies to "all confidential information with respect to business of a professional nature which arises in or is brought into the [Cayman] Islands and to all persons coming into possession of such information at any time thereafter whether they be within the jurisdiction or thereout." Cayman Confidential Relationships Law, Section 3(1). The Cayman Confidential Relationships Law, however, does not apply "to seeking, divulging or obtaining confidential information" in the investigation of certain offenses that violate Cayman Islands law. *See id.,* Section 3(2).

The Cayman Confidential Relationships Law

has no application to the seeking, divulging or obtaining of confidential information—

(a) in compliance with the directions of the Grand Court ...;

(b) by or to—

(i) any professional person acting in the normal course of business or with the consent, express or implied of the relevant principal;

(ii) a constable of the rank of Inspector or above investigating an offence committed or alleged to have been committed within the jurisdiction;

(iii) a constable of the rank of Inspector or above, specifically authorised (sic) by the Governor in that behalf, investigating an offence committed or alleged to have been committed outside the [Cayman] Islands which offense, if committed in the [Cayman] Islands, would be an offence against its laws;

(iv) the Financial Secretary, the Inspector or, in relation to particular information specified by the Governor, such other person as the Governor may authorise (sic);

(v) a bank in any proceedings, cause or matter when and to the extent to which it is reasonably necessary for the protection of the bank's interest, either as against its customers or as against third parties in respect of transactions of the bank for, or with, its customer; or

(vi) the relevant professional person with the approval of the Financial Secretary when necessary for the protection of himself [or herself] or any other person against crime; or

(c) in accordance with this or any other Law.

Cayman Confidential Relationships Law, Section 3(2).

The Cayman Confidential Relationships Law makes it a crime to divulge confidential information. *Id.,* Section 5. A person guilty of divulging confidential information is liable for a "fine of five thousand dollars and to imprisonment for two years." *Id.*

### 2. The Cayman Mutual Assistance Treaty

As indicated, the Cayman Island's Mutual Legal Assistance (U.S.A.) Law of 1986 was passed to give effect to the Treaty Concerning the Cayman Islands and Mutual Assistance in Criminal Matters, 3 July 1986, U.S.-U.K., S. Treaty Doc. No. 8, 100th Cong., 1st Sess. (1987) (the "Cayman MLAT"). Foster Aff., 4. The Cayman MLAT is intended to improve the effectiveness of law enforcement authorities of the United States and the Cayman Islands. Cayman MLAT, Article 3.

The Cayman MLAT provides for the establishment of a "Central Authority" by the United States and by the Cayman Islands. Cayman MLAT, Article 2. The Central Authority for the United States is the "Attorney General or a person designated by him [or her]." *Id.* The Central Authority for the Cayman Islands is the "Cayman Mutual Legal Assistance Authority or a person designated by it." *Id.* Requests for assistance under the Cayman MLAT are made by the "Central Authority of the Requesting Party to the Central Authority of the Requested Party." *Id.*

The assistance provided by the Cayman MLAT includes

(a) taking the testimony or statements of persons;

(b) providing documents, records, and articles of evidence;

(c) serving documents;

(d) locating persons;

(e) transferring persons in custody for testimony;

(f) executing requests for searches and seizures;

(g) immobilizing criminally obtained assets;

(h) assistance in proceedings related to forfeiture, restitution and collection of fines; and

(i) any other steps deemed appropriate....

Cayman MLAT, Article 1.

The assistance provided to the United States by the Cayman MLAT, however, is limited. Significantly, the assistance afforded by the Cayman MLAT does not apply to

(a) any matter which relates *directly* or *indirectly* to the regulation, including the imposition, calculation, and collection, of taxes....

Cayman MLAT, Article 3 (emphasis added).[5] Accordingly, the assistance provided by the Cayman MLAT does not extend to providing information on "pure tax matters." *See* Springer Decl., ¶ 5.[6]

### 3. Comity Analysis

The speculative arguments regarding harm that may be caused to the Offshore Bank and

5. The Cayman MLAT further provides:
2. The Central Authority of the Requested Party may deny assistance where:
(a) the request is not made in conformity with the provisions of [the Cayman MLAT];
(b) the request relates to a political offense or to an offense under military law which would not be an offense under ordinary criminal law; or
(c) the request does not establish that there are reasonable grounds for believing:
(i) that the criminal offense specified in the request has been committed; and
(ii) that the information sought relates to the offense and is located in the territory of the Requested Party;
3. The Central Authority shall deny assistance where the Attorney General of the Requested Party has issued a certificate to the effect that the execution of the request is contrary to the public interest of the Requested Party.
4. Before denying assistance ... the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting

Party to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting Party accepts assistance subject to these conditions, it shall comply with the conditions.
Cayman MLAT, Article 3.

6. During negotiations between the United States and the governments of the United Kingdom and the Cayman Islands leading to the Cayman MLAT, the government of the Cayman Islands "refused the requests of the U.S. delegation that pure income tax offenses, i.e., tax offenses based on income from legal proceeds, be included within the scope of the [Cayman MLAT]." Springer Decl., ¶ 5.

The Treaty with the United Kingdom on Mutual Legal Assistance on Criminal Matters, 6 January 1994, S. Treaty Doc. No. 194–2, 1994 WL 855115, does not contain a similar provision limiting assistance to non-tax related offenses. *See id.,* Article 3.

the banking industry of the Cayman Islands by the Government use of the Tape are insufficient to overcome the interest of the United States in its ongoing criminal investigation.

In *United States v. Davis*, 767 F.2d 1025 (2d Cir.1985), a United States citizen ("*Davis*") was charged with various crimes arising out of a scheme involving "the payment of multi-million dollar kickbacks to executives of General Electric in return for the approval of subcontracts...." *Id.* at 1027. In order to facilitate the payment of the kickbacks, Davis "organized and supervised the laundering of [a] kickback fund through an elaborate network of bank accounts in the United States, Canada, the Cayman Islands and Switzerland, and carried out the actual payment of the money laundering in the United States." *Id.*

In *Davis,* the Government issued a trial subpoena *duces tecum* to Davis' Cayman Islands Bank directing it to produce certain bank records. 767 F.2d at 1032. The district court ordered Davis to " 'take whatever steps are necessary to allow [his Cayman Islands bank] to comply with the subpoena that has been served upon it....' " *Id.* at 1033. Davis was further ordered to sign a form directing his Cayman Islands bank to produce the records. *Id.*

On appeal, Davis sought reversal of his conviction, in part, on the ground that the district court improperly ordered the production of his bank records from his Cayman Islands bank. *Id.* at 1027. The Second Circuit recognized the district court order implicated the interests of the Cayman Islands with regard to the Cayman Confidential Relationships Law. *See id.* at 1034–35. The court then proceeded to examine the manner in which the interests of both the United States and the Cayman Islands were implicated by the order. *See id.*

The Second Circuit concluded the "strong national interest" of the United States in the enforcement of its criminal laws outweighed the Cayman Islands' "vital national interest in preserving the privacy of its banking customers." *See* 767 F.2d at 1035–36. The court observed that the Davis Cayman Islands bank records were "essential to the Government's case." *Id.* at 1035. The court concluded the interest of the Cayman Islands was less compelling:

[W]hile the Cayman Islands has a vital national interest in preserving the privacy of its banking customers, the [Cayman Confidential Relationships Law] does not provide a blanket guarantee of privacy and has many exceptions.... In addition, since American citizens are required to reveal the existence of foreign bank accounts and report certain foreign transactions by American law, Cayman national interests are not impinged upon to the extent that the subpoenaed records contain information which Davis was required to disclose under American law.... Furthermore, the Cayman Islands has a policy against the use of its business secrecy laws to "encourage or foster criminal activities."

*Davis,* 767 F.2d at 1035.

The Second Circuit further held the district court properly exercised its power in ordering that Davis terminate legal actions he had initiated in the Cayman Island litigation which sought to prevent the release of his banking records to the U.S. Government. *Davis,* 767 F.2d at 1036. The Second Circuit held the district court order did not violate notions of international comity:

First, Davis' lawsuits in Cayman had a direct, substantial and foreseeable effect on the United States. The [Cayman bank's] records which the [G]overnment sought were an important part of the case against Davis, and Davis' Cayman litigation was instituted and pursued with the express purpose of preventing these documents from being introduced at trial.

Second, Davis had close links with the United States; he was both a citizen and a resident of this country.

Third, as discussed above, the United States had a strong national interest in safeguarding the integrity of its criminal process. In recent years Congress has become increasingly concerned with the use of offshore banks to launder the proceeds of criminal activities and evade taxes. *See* H.Rep. No. 98–907, 98th Cong.2d Sess. (1984)....

*Davis,* 767 F.2d at 1038. The court further found Davis did not have a justified expectation of privacy in his bank records and that, despite the strong national interest of the Cayman· Islands in "blocking the disclosure of Davis' bank records," the district court order was proper. *Id.* at 1039. Accordingly, the court concluded the district court order, although an "extraordinary remedy," was appropriate. *Id.*

In the instant case, the Government has shown it has a legitimate need to retain the Tape in order to conduct its investigation. *See United States v. Premises Known as 608 Taylor Avenue,* 584 F.2d 1297, 1302 (3d Cir. 1978); *compare Government of the Virgin Islands v. Edwards,* 903 F.2d 267, 273 (3d Cir.1990) (Government did not suggest the evidence there at issue was needed to aid any investigation).

Petitioners themselves "anticipate" the information contained on the Tape will lead to "widespread investigation and possibly prosecution of the [Offshore] Bank's clients." *See* 8 August 1996 Letter at 2. Accordingly, it appears Petitioners recognize the value to the Government of the information contained on the Tape.

Contrary to the argument of Petitioners, the Cayman MLAT does not provide a means to obtain the information needed by the Government in their investigation. As indicated, the Cayman MLAT does not provide for assistance to United States law enforcement officials regarding tax offenses. Accordingly, there is no alternative method available to the Government to seek the information contained on the Tape. If the Government were forbidden to use the Tape in its ongoing investigation of the "widespread tax evasion scheme" in which it believes the Offshore Bank played a central role, the information apparently would be completely lost to the Government. *See* Springer Aff., ¶ 5.

The interest of the Cayman Islands in maintaining the confidentiality of records protected by the Cayman Confidential Relationship Law, while vital, does not overcome the interests of the United States Government in investigating violations of its criminal laws. *See Davis,* 767 F.2d at 1035; *United States v. Bank of Nova Scotia,* 740 F.2d 817,

827–28 (11th Cir.1984) (grand jury subpoena upheld notwithstanding the Cayman Confidential Relationships Law), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985).

The Cayman Confidential Relationships Law does not provide absolute protection from disclosure of Cayman Islands banking information. While the enforcement of the law may be "vital" to the Cayman banking industry, "the law does not operate as a blanket guarantee of privacy and has many exceptions." *Bank of Nova Scotia,* 740 F.2d at 827. For example, disclosure of the information is permitted to aid in the domestic investigation of offenses committed or alleged to have been committed within or without the Cayman Islands. *See* Confidential Relationships Law, Section 3(2).

Because the information contained on the Tape is crucial to the Government's continuing investigation and the Cayman Confidential Relationships Law is not a guarantee of secrecy, a careful consideration of the competing interests weighs in favor of permitting the Government the continued use of the Tape. *See Payner,* 447 U.S. at 732 n. 4, 100 S.Ct. at 2444 n. 4 (Bahamian bank secrecy law did not create Fourth Amendment protection for depositor's account; law was not a blanket guarantee of privacy); *Davis,* 767 F.2d at 1038; *see also United States v. Frank,* 494 F.2d 145, 156–57 (2d Cir.) ("[N]o principle of accommodation requires the United States to seal the lips of American citizens testifying to facts within their knowledge concerning activities of other Americans in a foreign country as part of a scheme to violate American criminal law, simply because that country chooses to throw a veil of secrecy around bank accounts except insofar as their courts may see fit to lift it."), *cert. denied,* 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974).

*Conclusion*

For the reasons stated, the relief sought in the Petition is denied and the instant case is dismissed, with prejudice.